# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Wilson*, 2012 IL App (1st) 101038

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LORENZO WILSON, Defendant-Appellant. |
| District & No. | First District, Fifth Division<br>Docket No. 1-10-1038 |
| Filed | March 16, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In a prosecution for first degree murder and armed robbery, the admission of audiotaped and handwritten statements describing what defendant told a witness about the crimes was error under section 115-10.1 of the Code of Criminal Procedure because the witness did not have personal knowledge of the events described, but the error was harmless and did not warrant reversal of defendant's convictions where there was no reasonable probability the jury would have found defendant not guilty if the evidence had been excluded, and, furthermore, defendant's 75-year sentence was affirmed over his claim that the trial court failed to give adequate weight to the mitigating factors of his age and lack of a criminal history; however, the cause was remanded for correction of the mittimus to reflect the correct sentencing credit for defendant's presentence incarceration. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 07-CR-14511 (03); the Hon. Lawrence P. Fox, Judge, presiding. |
| Judgment | Affirmed and remanded with directions. |

Counsel on
Appeal

Michael J. Pelletier, Alan D. Goldberg, Benjamin Overby, and Katherine M. Donahoe, all of State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Tasha-Marie Kelly, and Janet C. Mahoney, Assistant State's Attorneys, of counsel), for the People.

Panel

PRESIDING JUSTICE EPSTEIN delivered the judgment of the court, with opinion.
Justices J. Gordon and McBride concurred in the judgment and opinion.

# OPINION

¶ 1    Following a jury trial, defendant Lorenzo Wilson was convicted of first degree murder and armed robbery. On appeal, defendant argues that the trial court improperly admitted, as substantive evidence, audiotaped and handwritten statements from State witness Charles Wilson. Defendant also argues that the trial court abused its discretion by imposing a 75-year sentence for the first degree murder conviction and that the mittimus should be corrected to reflect additional sentencing credit. For the reasons that follow, we affirm defendant's conviction and sentence, with directions to the clerk of the circuit court to correct the mittimus.

¶ 2                                BACKGROUND

¶ 3    In the early morning of June 15, 2006, Corey Ebenezer was shot and killed at Leona's Restaurant in Hyde Park. Erika Ray and Lorenzo Wilson were later charged with first degree murder and armed robbery and were tried in a single trial with separate juries.

¶ 4                       *Testimony From Leona's Employees*

¶ 5    At trial, the jury heard testimony from Justin Twine, Lucio Mastache, and Jason Sline, who worked with Erika at Leona's Restaurant. On the evening of June 14, 2006, a large group came into Leona's and sat down to order food. Twine, who was working as a server that night, testified that there were about 30 people in the party. Erika wanted to serve the entire group, but Corey Ebenezer, an assistant manager, told Erika that she could not handle the table alone. When Erika insisted that she serve the entire party, Ebenezer told her to go home. Erika refused and proceeded to serve the table.

¶ 6    Ebenezer called district manager Augustin Monnarez and informed him that he asked Erika to go home but she refused. Jason Sline, a manager, then received a call asking him to

-2-

go to the restaurant. Around 9 or 9:30 p.m., Sline arrived at Leona's and discussed what happened with Ebenezer, Erika, and the servers. Sline then told Erika that she would have to work at a different location of Leona's Restaurant. When Erika declined the offer, Sline fired her. Erika told Sline that she understood and then said, "But f*** you Corey, Corey, f*** you" and left the restaurant.

¶ 7    Around midnight, Mastache and Twine were still at Leona's. The restaurant was closed. As Mastache was cleaning the kitchen, he saw three unknown men hit Ebenezer in a small kitchen hallway near the cash registers at the private back entrance of the restaurant. Mastache then heard three gunshots. Mastache went to the front of the restaurant to find Twine, and when they returned to the kitchen, Ebenezer was lying next to a cash drawer on the floor. Ebenezer told Twine that he "just got ganked," which meant he had been robbed. Ebenezer later died from his injuries.

¶ 8                                    *Paris Gosha*

¶ 9    Paris Gosha is Erika's cousin and had been Lorenzo's friend since childhood. Gosha testified that he also was charged with the murder and armed robbery of Corey Ebenezer. In exchange for the State's agreement to drop the murder charges, Gosha agreed to testify against Erika and Lorenzo and plead guilty to the armed robbery charge. Gosha would receive a 30-year sentence (but understood that he would only serve half of it) and would be placed in a witness protection program. At the time of his testimony, Gosha was in the witness protection program in the Cook County jail, where he received various privileges, including a $35 weekly payment.

¶ 10   On the night of June 14, 2006, Gosha went to see friends at 54th and Peoria. Lorenzo came into the house and told him that Erika, who was in her car outside, wanted to speak with Gosha. Erika told Gosha that she had just been fired and wanted him "to beat her boss' ass." Gosha then gathered his younger brother, Demetrius (or "DJ"), and a friend named Anthony Macon to go with Erika and Lorenzo. Erika drove Lorenzo, Gosha, Macon, and DJ to Leona's and parked the car. As they waited, a man with a Jamaican accent approached the car three times and spoke with Erika about going into the restaurant. At one point, when the group was ready to enter the restaurant, the man told them to get back in the car. Gosha heard the man say that some people inside the restaurant with Ebenezer might help him fight.

¶ 11   After about two hours, Lorenzo, Gosha, Macon, and DJ entered the back entrance of Leona's. Lorenzo pointed a pistol at Ebenezer's face, and Gosha "grabbed some money" from the cash register. Lorenzo and Ebenezer began to struggle and a shot was fired. The men continued to wrestle until Macon came through the door and tried to break up the fight. Ebenezer slipped on the floor. Lorenzo then stood over him and shot him. The four men fled to Erika's car.

¶ 12   The next day, Gosha met with Lorenzo, Macon, and DJ at Gosha's house, where they watched news coverage about the shooting. Gosha did not see Lorenzo after that day. When Gosha first talked to police in August 2006, he told them he did not know anything. Gosha admitted his involvement in June 2007, after Macon had spoken to police about the incident.

¶ 13                              *Anthony Macon*

¶ 14        Anthony Macon testified that he was at 54th and Halsted on June 14, 2006. Erika pulled
up in her car, and Gosha and Lorenzo went to talk to her. Gosha and Lorenzo told Macon to
"come on," and he got in the car with them. Lorenzo told Macon that they were going to
Leona's because "some guy got her fired and they wanted to beat him up." Macon did not
hear Erika say that they should rob the man. As Erika drove to the restaurant, Macon saw
Lorenzo, who was seated next to him in the backseat, holding a small gun with a pearl
handle.

¶ 15        After Erika parked her car, a man with an accent came and spoke to her. When he spoke
with Erika a second time, she moved her car down the street and parked because it was time
for the men to go inside. Erika told the group that the back door would be open. Macon
headed to the front entrance while the others went to the back entrance. Macon then heard
two gunshots coming from inside and headed to the back door. There, he saw Lorenzo,
Gosha, DJ, and a man fighting. Macon tried to pull Gosha out of the struggle.

¶ 16        The group returned to Erika's car. Gosha got into the trunk while the others got in the
backseat. Macon then heard Wilson say that he thought he killed the man inside the
restaurant. The group returned to Gosha's house and met again there the next day.

¶ 17        Macon told police in July 2006 that he did not know Gosha or Lorenzo and did not know
anything about the shooting. Two weeks later, Macon told detectives about the incident.
Macon testified that he could not remember if, during a January 2007 interview with police,
he stated that he did not know if Lorenzo had a gun until he got back in the car after the
shooting. Macon explained that after giving the statements, he was never charged with any
crime. Macon testified that neither the police nor the State's Attorney promised that Macon
would not be charged if he gave a specific statement or testified a certain way.


¶ 18                              *Charles Wilson*

¶ 19        Charles Wilson, the great-uncle of Lorenzo Wilson, testified for the State. Charles had
lived in Gulfport, Mississippi, but he was currently in federal prison for a gun possession
conviction in an unrelated case. Charles initially testified that he did not see his great-nephew
in the courtroom, but after Lorenzo stood up, Charles acknowledged that Lorenzo was his
great-nephew. When asked if he was in Chicago in June 2006, Charles testified that he did
not recall and then indicated that he would "plead the Fifth." The State asked for a sidebar
and indicated that it would grant use immunity to Charles in exchange for his testimony. The
court signed a form adjudging Charles a material witness and ordering him to testify.

¶ 20        Outside the presence of the jury, the court told Charles that he could not plead the fifth
amendment and that he would face contempt charges if he did not testify. Charles responded
that he would take the punishment. The State then informed the court that it wished to
confront Charles with three prior inconsistent statements. The State argued that all these prior
statements were admissible under two statutes: the "regular prior inconsistent statement
statute" (725 ILCS 5/115-10.1 (West 2008)) and the statute covering admissibility of prior
statements when a witness refuses to testify despite a court order (725 ILCS 5/115-10.2
(West 2008)). Counsel for Lorenzo objected to the statements' admissibility under both

statutes, but the court found them admissible as prior inconsistent statements under section 115-10.1.

¶ 21    After the jury returned, the State asked Charles about his prior statements: an audiotaped statement he gave to Sergeant Schlicht of the Gulfport police department in Mississippi on December 6, 2006; a signed handwritten statement Charles gave to Detective Lutzow of the Chicago police department and Assistant State's Attorney Martha Kross on December 19, 2006; and Charles's testimony before a grand jury on May 24, 2007. Charles stated either that he did not recall making the statements, he did not know if he made them, or he was "high on drugs" when he made the statements. At one point, Charles also testified that he did not make the statements and he was the one who shot Ebenezer.

¶ 22    The State confronted Charles with his three prior statements, which all provided a similar account of his interactions with Lorenzo. On the evening of June 14, 2006, Charles was visiting Lorenzo's mother at her house in Chicago. Lorenzo returned home very late that night and was not acting like himself. Charles asked him what was wrong. Lorenzo responded, "I think I shot somebody." Charles asked if he had killed the person, but Lorenzo responded that he did not know. Charles told Lorenzo to tell his father. The next day, Charles learned that Lorenzo had not told his father what had happened, so Charles told him.

¶ 23    Later that day, Charles heard Lorenzo tell his father additional details about the shooting. Lorenzo stated that the girl who lived across the street had gotten fired and "she wanted Lorenzo and some other guys who hang out with the girl to go to the restaurant where the girl worked and stick up the person who fired her." Lorenzo told Charles that "they were going to go in there, stick up the person who fired her, and take the money." At the restaurant, Lorenzo pointed a gun at the man, who rushed at him. Lorenzo said that he then started shooting. Later that day, news came on television about the shooting at Leona's, including a picture of the man who was shot. Lorenzo said that he had shot the man in the picture.

¶ 24    Lorenzo's parents asked Charles to take Lorenzo to Charles's home in Mississippi. Lorenzo and Charles left later that night, when it was dark, so that the neighbors would not see them go. As they were driving to Mississippi, Charles asked Lorenzo where the gun was. Lorenzo pulled a rag out of his pocket and showed Charles the dismantled gun. Lorenzo said that the gun was the one he used to shoot the man in the restaurant. Charles told him to get rid of the gun, and Lorenzo started to throw parts of it out the window. Charles told him to stop, however, because he thought the handle, spring, and clip would fit one of his other guns. Lorenzo stayed with Charles in Mississippi for about four months and then went to stay with his "play niece" in Miami, Florida.

¶ 25    The State called three witnesses to prove up Charles's prior statements. Assistant State's Attorney Sanjay Patel testified regarding Charles's grand jury testimony, which he read in its entirety to the jury. Next, Assistant State's Attorney Martha Kross testified as to Charles's handwritten statement, which contained similar information to the grand jury testimony. The State then called Sergeant Schlicht of the Gulfport, Mississippi, police department. Schlicht explained that in November 2006, Charles Wilson was brought into the police department on weapons charges. Schlicht received information that Charles wanted to speak with him regarding a homicide in Chicago. On December 6, 2006, Schlicht took a 10-minute audio

recording of Charles's statement. The recording was played for the jury.

¶ 26 The State also asked Charles about documents drafted by the Gulfport police in which Charles consented to a search of his truck and a search for gun parts in his home. Charles stated that he kept a plastic box of various gun parts in his home and that he vaguely remembered going with the Gulfport police to his home and showing them where the handle, spring, and clip were. When the State showed Charles a handle to the gun, he stated he did not know what it was and he did not recognize it.

¶ 27 The jury also heard testimony from Sergeant Schlicht and Detective Brian Lutzow of the Chicago police department regarding recovery of gun parts at Charles's residence and the arrest of Lorenzo Wilson. Charles consented to a search of his home, during which police recovered a gun handle, clip, and coil spring. Charles told police that the gun parts belonged to Lorenzo and were part of the gun Lorenzo had in the car on the trip from Chicago to Mississippi. Detective Lutzlow testified that he received the inventoried gun parts. Later, based on information received from Charles, Lorenzo was arrested and transported back to Chicago.

¶ 28                                      *Verdict and Sentencing*

¶ 29 The State rested, and the court denied defendant's motion for a directed verdict. Defendant then rested. The jury found defendant guilty of first degree murder and armed robbery and found that defendant personally discharged a firearm that proximately caused the death of Corey Ebenezer. The court sentenced defendant to 75 years for first degree murder and 20 years for armed robbery, with the sentences to be served concurrently. This appeal followed.

¶ 30                                            ANALYSIS

¶ 31 Defendant raises a number of arguments as to why the trial court erred in admitting Charles Wilson's prior inconsistent statements. At the outset, we note that defendant does not contest the State's presentation of Charles's sworn grand jury testimony. All claims of error are limited to the admission of the audiotaped and handwritten statements.

¶ 32    *Charles Wilson's Statements Describing Defendant's Account of the Shooting*

¶ 33 Defendant first contends that the portions of Charles Wilson's audiotaped and handwritten statements that describe what defendant told him about the shooting should not have been admitted as substantive evidence under section 115-10.1 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-10.1 (West 2008)). In each prior statement, Charles recounted defendant's description of the shooting, including his statement just after the shooting, "I think I shot somebody." Defendant argues that Charles did not have personal knowledge of the events defendant described, as required by the statute.

¶ 34 Before we address the claim of error, we consider whether defendant forfeited review of this issue. To preserve an issue for review, a defendant must object both at trial and in a written posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). A general objection

-6-

is generally not enough to preserve an issue for review, and "[o]bjections to evidence should especially designate the particular testimony considered objectionable and point to the objectionable features." *People v. Graves*, 142 Ill. App. 3d 885, 894 (1986); see *People v. Pastorino*, 91 Ill. 2d 178, 192 (1982). The State contends that defendant forfeited the issue because defense counsel only made a "general objection" without raising an argument specific to the personal knowledge requirement.

¶ 35    After Charles testified that he did not recall his prior statements, the State argued that his statements should be admitted first under section 115-10.1 (725 ILCS 5/115-10.1 (West 2008)), the "regular prior inconsistent statement statute." The State went on to argue that Charles's statements were also admissible under section 115-10.2 (725 ILCS 5/115-10.2 (West 2008)), which governs admissibility of prior statements when a witness refuses to testify despite a court order. Defense counsel first addressed section 115-10.2 and argued, *inter alia*, that if the court admitted any prior statements, it should limit admission to those "in which the witness, Charles Wilson, has personal knowledge as opposed to statements made by Lorenzo Wilson, describing other events." Defense counsel then turned to section 115-10.1 and began by arguing that the State had not yet established lack of memory. The trial court interjected, finding that because Charles testified that he did not remember being in Chicago or driving his great-nephew to Mississippi, the "lack of memory" requirement was satisfied for "all the statements" in the "[g]rand jury testimony, written statement, [audio]taped statement." The court concluded that Charles's answers regarding lack of memory "open[ed] the door for the [S]tate to offer those statement as prior inconsistent statements under *** 115-10.1."

¶ 36    In a posttrial motion, defense counsel argued that the trial court "erred in admitting the prior statements of Charles Wilson" because, *inter alia*, "the statements did not have certain circumstantial guarantees of trustworthiness." In considering this argument at the hearing, the trial court referenced section 115-10.1 and found that all of Charles's prior inconsistent statements "describe[d] events or conditions which he had personal knowledge of." In the trial court's view, Charles had personal knowledge of "driving the defendant all the way down to Mississippi, having conversations with him on the way, observing events that occurred shortly after the crime was committed, and things that were said and done at that time."

¶ 37    Based on the foregoing, we conclude that defendant preserved the claim of error. Defense counsel specified the objectionable testimony ("statements made by Lorenzo Wilson, describing other events") and explained why those statements were objectionable (they were not within Charles's personal knowledge). See *Graves*, 142 Ill. App. 3d at 894. Counsel renewed the objection in the posttrial motion, and the trial court specifically found that Charles's prior inconsistent statements were admissible as substantive evidence under section 115-10.1 because he had personal knowledge of "things that were said and done at the time." As a result, if we find error, we will consider whether the error is harmless. See *In re E.H.*, 224 Ill. 2d 172, 180 (2006) (evidentiary error is harmless " 'where there is no *reasonable probability* that the jury would have acquitted the defendant absent the' error" (emphasis in original) (quoting *People v. Nevitt*, 135 Ill. 2d 423, 447 (1990))).

¶ 38    We now turn to the admissibility of the portions of Charles's prior audiotaped and

handwritten statements that recount defendant's statements about the shooting. The admission of evidence lies within the discretion of the trial court, and we review the trial court's decision to admit evidence for an abuse of discretion. *People v. Becker*, 239 Ill. 2d 215, 234 (2010). The general rule is that hearsay, defined as "an out-of-court statement *** offered to prove the truth of the matter asserted," is inadmissible at trial. (Internal quotation marks omitted.) *People v. Gonzalez*, 379 Ill. App. 3d 941, 954 (2008). There is an exception to the hearsay rule for prior inconsistent statements of a testifying witness, which may be admitted to impeach the witness's credibility. *People v. McCarter*, 385 Ill. App. 3d 919, 932 (2008). Under section 115-10.1, a prior inconsistent statement may be offered not just for purposes of impeachment, but as substantive evidence, so long as the witness is subject to cross-examination and the statement:

"(1) was made under oath at a trial, hearing, or other proceeding, or

(2) narrates, describes, or explains an event or condition of which the witness had personal knowledge, and

    (A) the statement is proved to have been written or signed by the witness, or

    (B) the witness acknowledged under oath the making of the statement either in his testimony at the hearing or trial in which the admission into evidence of the prior statement is being sought, or at a trial, hearing, or other proceeding, or

    (C) the statement is proved to have been accurately recorded by a tape recorder, videotape recording, or any other similar electronic means of sound recording." 725 ILCS 5/115-10.1(c) (West 2008).

Defendant argues that portions of Charles's audiotaped and handwritten statements are inadmissible under section 115-10.1(c)(2) because the statute requires that Charles had "personal knowledge" of the "event" described in the statements, *i.e.*, the shooting. The State counters that the "event" in question is defendant's act of verbal admission, and thus the personal knowledge requirement is satisfied because Charles had personal knowledge of any of defendant's statements to him. We decline to adopt the State's interpretation of the personal knowledge requirement for three reasons.

¶ 39    First, as the State acknowledges, this court has previously concluded that, under the plain language of section 115-10.1(c)(2), "the witness whose prior inconsistent statement is being offered into evidence must actually have seen the events which are the subject of th[e] statement." (Internal quotation marks omitted.) *McCarter*, 385 Ill. App. 3d at 930 (quoting *People v. Cooper*, 188 Ill. App. 3d 971, 973 (1989)); *People v. Morales*, 281 Ill. App. 3d 695, 701 (1996). This means that section 115-10.1(c)(2) does not encompass "statements made to the witness by a third party, where the witness has no firsthand knowledge of the event that is the subject of the statements made by the third party." *People v. Morgason*, 311 Ill. App. 3d 1005, 1011 (2000). The decisions of this court interpreting the personal knowledge requirement rest on unusually detailed legislative history. See *People v. Hubbard*, 276 Ill. App. 3d 98, 105 (1995) ("The origins of section 115-10.1 can be found in a 1977 Michigan Law Review article written by professor Michael H. Graham, then of the University of Illinois." (citing Michael H. Graham, *Employing Inconsistent Statements for Impeachment and as Substantive Evidence: A Critical Review and Proposed Amendments*

*of Federal Rules of Evidence, 801(d)(1)(a), 613 and 607*, 75 Mich. L. Rev. 1565 (1977))); accord *People v. Wilson*, 302 Ill. App. 3d 499, 507-08 (1998) ("In the legislative debate, lawmakers acknowledged that [section 115-10.1] had its genesis in that article.").

¶ 40    Second, the State's reading of the statute would keep the personal knowledge requirement from doing what it was designed to do: ensure that the out-of-court statements are trustworthy. The personal knowledge requirement is meant to ensure reliability by "giving defendants a meaningful opportunity for cross-examination." *McCarter*, 385 Ill. App. 3d at 930. For a witness who "merely narrat[es] a third-party statement about which the witness has no personal knowledge, cross-examination gives the jury no insight into the truth of that statement, making it more difficult to judge its reliability." *Id.* at 931. The requirement provides an additional "indicia of reliability" because "a witness is less likely to repeat another's statement if he witnessed the event and knows the statement is untrue." *People v. Morales*, 281 Ill. App. 3d 695, 701 (1996) (citing Robert J. Steigmann, *Prior Inconsistent Statements as Substantive Evidence in Illinois*, 72 Ill. B.J. 638 (1984)); Graham, *supra*, at 1585 n.53. Finally, while as a general matter there is a risk of "subtle influence, coercion, or deception" in the process surrounding taking of a written or audiotaped statement, a witness with personal knowledge of the event related can not only provide details of the recording of his statement, but "is in a position to advise the trier of fact of what he now contends actually occurred." Graham, *supra*, at 1588. The State's proposed interpretation of the statute would extend substantive admissibility to statements that carry none of these assurances of reliability.

¶ 41    Third, the State's interpretation of the statute would essentially render the personal knowledge language superfluous, as "[p]ersonal knowledge of the existence of the statement is already required under the rubric of authentication." Michael H. Graham, Graham's Handbook of Illinois Evidence § 801.11 (10th ed. 2010); see Ill. R. Evid. 901(b)(1) (eff. Jan. 1, 2011) ("Testimony that a matter is what it is claimed to be" satisfies the authentication requirement.). If we were to adopt the State's proposed construction, we would not only overturn decades of precedent and frustrate the purpose of carefully crafted statutory language, we would deprive the personal knowledge requirement of any significance at all.

¶ 42    We conclude that the trial court erred in admitting those portions of Charles's audiotaped and written statements that describe what defendant said about the shooting. This includes defendant's account of the plan to go to Leona's to rob Erika's boss, his description of what happened at Leona's, his statements that he thought he shot somebody, and defendant's explanation that the pearl-handled gun was the one he used in the shooting. By contrast, the trial court properly admitted portions of the statements that describe events within Charles's personal knowledge, including Charles's observation of defendant's appearance when he arrived home late at night, his account of taking defendant to Mississippi and Florida, and his view of defendant throwing pieces of a pearl-handled gun out of the car window.

¶ 43    The State contends that even if portions of Charles's audiotaped and handwritten statements were inadmissible as substantive evidence, they could be presented to the jury as impeachment evidence. Although the jury in this case was allowed to consider these statements as substantive evidence, whether the statements were admissible as impeachment evidence may ultimately have an effect on our harmless error analysis. See *People v.*

*Morales*, 281 Ill. App. 3d 695, 701 (1996) (finding that improper admission of prior written statement as substantive evidence was harmless where statement was admissible as impeachment evidence and the jury considered virtually the same evidence substantively with the admission of witness's grand jury testimony); see also *McCarter*, 385 Ill. App. 3d at 930.

¶ 44    The State may attack the credibility of a witness, even its own witness, by impeaching the witness with a prior inconsistent statement. *People v. Cruz*, 162 Ill. 2d 314, 358 (1994). This is true even if the statement does not meet all the requirements of section 115-10.1. See 725 ILCS 5/115-10.1 (West 2008) ("Nothing in this Section shall render a prior inconsistent statement inadmissible for purposes of impeachment because such statement *** fails to meet the criteria set forth herein."). There is an important limitation, however, when the State impeaches its own witness with a prior inconsistent statement: the State must show that the witness's trial testimony affirmatively damaged its case. *Cruz*, 162 Ill. 2d at 360. The testimony must do more than merely disappoint the State by failing to incriminate defendant; the testimony must give "positive aid" to the defendant's case. *Id.*; *McCarter*, 385 Ill. App. 3d at 933 (noting that requirement would be satisfied where testimony is "inconsistent with the defendant's guilt under the State's theory of the case").

¶ 45    The State contends that a witness's testimony may be considered damaging when a witness professes a lack of memory regarding his prior testimony. We acknowledge that in *People v. Leonard* the Third District Appellate Court found that "[w]hen a witness professes a lack of memory regarding a prior statement, his testimony may be considered damaging." *People v. Leonard*, 391 Ill. App. 3d 926, 933 (2009) (citing *People v. Speed*, 315 Ill. App. 3d 511, 517 (2000)). We find no support for that conclusion in *Speed*, which only addressed the "inconsistency" requirement in connection with the substantive admission of prior statements, not the affirmative damage requirement for impeaching one's own witness. See *Speed*, 315 Ill. App. 3d at 517. We also find the statement from *Leonard* contrary to our supreme court's instruction that " '[d]amage' *** does not occur where a party interrogates a witness about a fact which would be favorable to the examiner if true, but then receives a reply which is merely negative in its effect on the examiner's case." *Cruz*, 162 Ill. 2d at 360; see also Michael H. Graham, Graham's Handbook of Illinois Evidence § 607.4 (10th ed. 2010) ("To the extent that *People v. Leonard* *** asserts that a professed lack of recollection is to be considered affirmatively damaging with respect to impeachment of a witness called by that party by means of a prior inconsistent statement not substantively admissible, *Leonard* is completely wrong and must not be followed."). We decline to adopt the statement of law set forth in *Leonard*, and we conclude that a witness's professed lack of memory, standing alone, does not "affirmatively damage" a party's case for the purpose of impeaching one's own witness.

¶ 46    The State offers one additional reason why Charles's testimony damaged its case. According to the State, Charles's testimony was damaging because Charles claimed that he, not defendant, killed Ebenezer. We recognize that testimony suggesting that another person committed the crime may affirmatively damage the State's case because the testimony is "inconsistent with the defendant's guilt under the State's theory of the case." *McCarter*, 385 Ill. App. 3d at 933; see also *Cruz*, 162 Ill. 2d at 362. In the present case, however, the record

shows that Charles was not seriously confessing to killing Ebenezer; he was making every attempt to avoid testifying against his nephew. (After claiming that he committed the murder, the State asked Charles, "Is this a joke?" and he responded, "Evidently it is. I asked you to let me go back to my cell.") There is no suggestion in the record that defendant's counsel seriously pursued any argument that Charles was in any way involved in the shooting at Leona's. In fact, the State made use of Charles's incredible statements, telling the jury, "I guess we know who the real killer is in this case, because Charles Wilson said, I, I, I did it. I guess we should just drop this case against Lorenzo." The State also argued that the jury should "forget the nonsense that [Charles] tried to interject in this trial." Charles Wilson's throwaway comment that he killed Ebenezer did not affirmatively damage the State's case.

¶ 47      We note that impeaching a witness with a prior inconsistent statement is only necessary when there is a reason to attack the credibility of the witness. Where, as here, a party calls a witness who offers no damaging testimony, there is no need to cast doubt on the witness's testimony by challenging his credibility. *Cruz*, 162 Ill. 2d at 362. The only reason for a party to introduce a prior inconsistent statement in this circumstance "is to get it before the jury as substantive evidence." *McCarter*, 385 Ill. App. 3d at 933. Our supreme court has directed just the opposite course, calling for "rigorous enforcement" of the affirmative damage requirement in order to foreclose the "introduction of oral inconsistent statements under the guise of impeachment." *Cruz*, 162 Ill. 2d at 362. Charles Wilson's prior inconsistent statements were not admissible to impeach his credibility.

¶ 48      *Remaining Portions of Charles Wilson's Audiotaped and Written Statements*

¶ 49      Although we have concluded that it was error to admit certain portions of Charles Wilson's written and audiotaped statements as substantive evidence, defendant additionally claims that the audiotaped and written statements should not have been admitted–in their entirety–because they were unnecessarily duplicative of Charles's grand jury testimony. Defendant argues, first, that the additional statements should have been barred by the rule against prior consistent statements, and second, that the prejudicial effect of the additional statements substantially outweighed their probative value because the statements were cumulative. The parties again disagree about whether the error was properly preserved, but we need not resolve that issue because we conclude that there was no error in admitting those portions of the audiotaped and handwritten statements to which Charles Wilson had personal knowledge.

¶ 50      Defendant's contention that admission of multiple prior inconsistent statements from the same witness violates the rule against prior consistent statements has been addressed at length, and rejected, by this court. See *People v. White*, 2011 IL App (1st) 092852, ¶¶ 49-54; *People v. Santiago*, 409 Ill. App. 3d 927, 931-34 (2011); *People v. Maldonado*, 398 Ill. App. 3d 401, 423 (2010); *People v. Johnson*, 385 Ill. App. 3d 585, 608 (2008). In this case, defendant raises no new arguments, and we see no reason to depart from this court's uniform rejection of those arguments in these earlier cases.

¶ 51      Defendant also argues that the trial court abused its discretion in admitting more than one prior inconsistent statement from Charles Wilson because once one prior statement was

-11-

admitted, the additional statements had little probative value and were unnecessarily cumulative. See *People v. Culbreath*, 343 Ill. App. 3d 998, 1004 (2003) ("[T]he exclusion of cumulative evidence is within the discretion of the trial court, whose ruling will not be reversed absent a clear abuse of that discretion." (quoting *Dillon v. Evanston Hospital*, 199 Ill. 2d 483, 495 (2002))); see also Ill. R. Evid. 403 (eff. Jan. 1, 2011) ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice *** or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."). Because we have already found that certain portions of the audiotaped and handwritten statements were inadmissible under section 115-10.1, we consider this claim of error as to the remaining portions of these statements (*i.e.*, those portions that meet the statutory requirement of personal knowledge).

¶ 52    Defendant contends that after the first statement was admitted, the additional prior statements were "cumulative" and unnecessary because they "add[ed] nothing to what was already before the jury." See *People v. Ortiz*, 235 Ill. 2d 319, 335 (2009). We disagree. In this case, Charles repeatedly denied knowledge or memory of making his prior statements (or alternatively claimed that he was under the influence of drugs when he gave the statements). Once one prior statement was admitted, the jury had to assess that statement in light of Charles's claim at trial that he did not make it or was intoxicated at the time. The two additional statements had probative value: the fact that Charles made additional statements at different times to different officials further damaged his claims at trial that he did not make the statements or was on drugs at the time. *Cf. People v. Harvey*, 366 Ill. App. 3d 910, 922 (2006) (disagreeing with the defendant's claim that admission of additional prior inconsistent statement was cumulative because the evidence "served two distinct purposes": to impeach the witness's credibility and to serve as substantive evidence).

¶ 53    We cannot say that after one prior statement was admitted, confronting Charles with additional prior statements added nothing to what was already before the jury. We conclude that any repetition of the statements did not require their exclusion from evidence. *Cf. People v. Fields*, 285 Ill. App. 3d 1020, 1028 (1996) (finding that even "unnecessary" repetition of witness's prior inconsistent statements did not rise to the level of prejudice). The trial court did not abuse its discretion in admitting portions of Charles's prior statements that met the personal knowledge requirement of section 115-10.1.

¶ 54                    *Harmless Error*

¶ 55    We have found error in the admission of those portions of Charles Wilson's audiotaped and handwritten statements describing what defendant told him about the shooting, including defendant's statements that he shot Ebenezer. This error only warrants reversal, however, if we find that it is not harmless. An error is harmless " 'where there is no *reasonable probability* that the jury would have acquitted the defendant absent the' error." (Emphasis in original.) *In re E.H.*, 224 Ill. 2d 172, 180 (2006) (quoting *People v. Nevitt*, 135 Ill. 2d 423, 447 (1990)).

¶ 56    The State contends that the error in admitting portions of Charles's audiotaped and handwritten statements is harmless because he made nearly verbatim statements in his sworn

grand jury testimony, which was indisputably admissible under 725 ILCS 5/115-10.1(c)(1) (West 2008). We agree. This court's decision in *People v. Harvey*, 366 Ill. App. 3d 910 (2006), is instructive. In *Harvey*, the court found that portions of two witnesses' prior written statements, which contained the defendant's confession that he shot someone and then fled the scene, were improperly admitted because neither of the witnesses had personal knowledge of the event. *Harvey*, 366 Ill. App. 3d at 921. The court found that the error was harmless, however, "because the jury was permitted to consider substantively virtually identical evidence contained in the recanting witnesses' grand jury testimonies." *Id.* at 921-22. Here, as in *Harvey*, the jury was permitted to consider Charles's grand jury testimony, which contained all the portions of the audiotaped and handwritten statements that we have found were not properly admitted. See *id.*; see also *People v. Sims*, 285 Ill. App. 3d 598, 610 (1996) (concluding that error in admitting evidence was harmless because it was cumulative of properly admitted evidence); *People v. Mulvey*, 366 Ill. App. 3d 701, 714 (2006) (same).

¶ 57 Defendant nevertheless argues that the error is not harmless because the State commented during closing arguments that Charles said the same thing in each of his prior statements. According to defendant, the State's argument hurt defense counsel's theory that Charles made the statements to avoid criminal charges. We note, first, that the State only made this point in addition to arguing that it was unbelievable for Charles to have made up all the details regarding the shooting in order to avoid liability; that it would be "absurd" for the assistant State's Attorney to put Charles on the stand if he was on drugs; and that Charles testified to the grand jury almost a year after his charges were dismissed. The jury's conclusion that defendant shot Ebenezer also did not depend solely on Charles's prior inconsistent statements. The jury heard detailed testimony from Paris Gosha and Anthony Macon regarding the specifics of what happened at Leona's. Macon saw defendant with a pearl-handled gun in the back of the car, and Gosha watched as defendant stood over Ebenezer and shot him. Macon also testified that while the group was traveling away from Leona's after the shooting, defendant said that he thought he killed the man inside the restaurant. Even if this testimony was somewhat weakened by evidence that Gosha took a plea deal and Macon was not charged for his involvement, the testimony of Gosha and Macon provided strong corroboration for defendant's confession. The jury also heard convincing circumstantial evidence of defendant's guilt. Defendant left for Mississippi immediately after the shooting, he threw parts of a pearl-handled gun out of the car window, and the pearl handle that he kept was later found in Charles's Mississippi home.

¶ 58 In light of all the evidence, we conclude that even without the improperly admitted portions of Charles Wilson's audiotaped and handwritten statements, there is no reasonable probability that the jury would have acquitted defendant. The error in admitting these statements is harmless and does not warrant reversal of defendant's conviction.

¶ 59 *Sentence for First Degree Murder Conviction*

¶ 60 Finally, defendant argues that his 75-year sentence for first degree murder was excessive because the circuit court did not give adequate weight to mitigating factors, including defendant's age and his lack of criminal history. The trial court has "broad discretionary

powers" in sentencing a defendant. *People v. Jones*, 168 Ill. 2d 367, 373 (1995). "Where the sentence chosen by the trial court is within the statutory range permissible for the pertinent criminal offense for which the defendant has been tried and charged, a reviewing court has the power to disturb the sentence only if the trial court abused its discretion in the sentence it imposed." *Id.* at 373-74.

¶ 61    "In sentencing a defendant, a trial court must balance the retributive and rehabilitative purposes of the punishment taking into account both the seriousness of the offense and the objective of restoring the offender to useful citizenship." *People v. Cooper*, 283 Ill. App. 3d 86, 95 (1996) (citing *People v. Hernandez*, 278 Ill. App. 3d 545, 555 (1996)); Ill. Const. 1970, art. I, § 11. The trial court may appropriately consider the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age when sentencing a defendant. *People v. Fern*, 189 Ill. 2d 48, 53 (1999). The court may also consider the nature of the crime, protection of the public, deterrence, and punishment. *People v. Jackson*, 357 Ill. App. 3d 313, 329 (2005). "It has been emphasized that the trial court is in a superior position to assess the credibility of the witnesses and to weigh the evidence presented at the sentencing hearing." *Jones*, 168 Ill. 2d at 373.

¶ 62    In this case, the sentence imposed by the court was within the statutory range. The sentencing range for first degree murder is 20 to 60 years. 730 ILCS 5/5-8-1(a)(1)(a) (West 2008) (now 730 ILCS 5/5-4.5-20(a) (West 2010)). But because the jury found that defendant personally discharged a firearm that proximately caused Ebenezer's death, the court sentenced defendant pursuant to section 5-8-1(a)(1)(d)(iii) of the Unified Code of Corrections (730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2008)), which provides that 25 years up to a term of natural life "shall be added" to the sentence. The court therefore concluded that defendant could be sentenced to anywhere from 45 years to life and sentenced defendant to 75 years.

¶ 63    Before sentencing defendant, the court considered arguments from counsel, defendant's statement in allocution, and a victim impact statement from Ebenezer's fiancée. The court then reviewed evidence in mitigation and aggravation. As to mitigation, the court commented that defendant had no criminal history, was a high school graduate, and had been accepted into college. Although the court appreciated defendant's apology to the victim's family and request for forgiveness, the court found that defendant's statement that someone else may have shot the victim was "not supported by the evidence" and would affect "the weight to be given to his statement in allocution." While defendant contends that the court failed to consider his age as a mitigating factor, the trial judge reviewed the presentence investigation report containing defendant's age and heard defense counsel compare defendant's age upon release under various sentences. In any event, where "defendant offers no evidence, aside from the sentence itself, that the trial court failed to consider the mitigating evidence, we may assume that the trial court properly considered it." *People v. Jones*, 376 Ill. App. 3d 372, 393 (2007).

¶ 64    The court balanced the mitigating factors against the seriousness of the crime, which the court characterized as "senseless and just horrific," noting that "it didn't take a whole lot from what the evidence shows, to prompt [defendant] to do what he did." As to the nature of the crime, the court stated that it had nothing to add to the victim impact statement, which

was the most "profound and articulate *** [the court] had ever heard."

¶ 65    Defendant contends that the trial court did not give enough weight to factors in mitigation. The record shows that the court thoroughly considered the mitigating and aggravating factors in determining defendant's sentence. After presiding over the trial and considering the evidence presented at the sentencing hearing, the trial court, in its considerable discretion, found that a sentence somewhere in the middle of the statutory range was appropriate. It is not the province of this court to reweigh the sentencing factors, and we may not substitute our judgment for that of the trial court merely because we may have weighed the sentencing factors differently. *People v. Streit*, 142 Ill. 2d 13, 19 (1991); *People v. Coleman*, 166 Ill. 2d 247, 261-62 (1995). The trial court did not abuse its discretion in imposing the sentence.

¶ 66                                        *Correction to the Mittimus*

¶ 67    The parties agree that the mittimus does not correctly reflect the number of days he was incarcerated prior to his sentencing. Defendant was arrested on June 13, 2007, and remained in custody until he was sentenced on March 31, 2010. Defendant was thus incarcerated for 1,022 days, not 941 as the mittimus reflects, prior to his sentencing. See *People v. Williams*, 239 Ill. 2d 503, 504 (2011). Accordingly, we instruct the clerk of the circuit court to correct the mittimus to reflect a total of 1,022 days of sentencing credit.

¶ 68                                              CONCLUSION

¶ 69    For all the foregoing reasons, we affirm defendant's conviction and sentence and direct the clerk of the circuit court to correct the mittimus.

¶ 70    Affirmed and remanded with directions.