2020 IL App (2d) 180450-U
No. 2-18-0450
Order filed May 13, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lee County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 11-CF-13 |
| NIKOS M. KASTRINSIOS, | ) ) ) | Honorable Ronald M. Jacobson, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE HUDSON delivered the judgment of the court.
Justices McLaren and Zenoff concurred in the judgment.

**ORDER**

¶ 1     *Held*:  The trial court did not abuse its discretion by excluding certain impeachment evidence and barring defendant from recalling the victim to lay a proper foundation, as defendant had the opportunity to cross-examine the victim, but the line of inquiry was too general to impeach him with a prior inconsistent statement; moreover, any potential error was harmless.

¶ 2     Defendant, Nikos M. Kastrinsios, appeals from his conviction in the circuit court of Lee County of aggravated criminal sexual abuse (720 ILCS 5/12-16(d) (West 2010)), contending that the trial court erred in barring admission of a prior inconsistent statement, because he failed to lay a proper foundation, and in prohibiting him from recalling a witness to lay the foundation.  We

conclude that defendant failed to lay the proper foundation, and the court properly prohibited him from recalling the witness. In any event, as the alleged errors were harmless, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4     Defendant was charged by information with one count of aggravated criminal sexual abuse of a victim, C.M., who was at least 13 years old but under 17 years old (720 ILCS 5/12-16(d) (West 2010)) and one count of knowingly possessing child pornography (720 ILCS 5/11-20.1(a)(6) (West 2010)). The charges were severed, defendant was tried first on the child pornography charge and found guilty, and we affirmed. See *People v. Kastrinsios*, 2019 IL App (2d) 170521-U. Defendant opted for a jury trial on the aggravated-criminal-sexual-abuse charge.

¶ 5     At a pretrial conference, defendant's attorney advised the trial court that a potential witness, James Jameson, had been in custody with defendant. According to defendant's attorney, after Jameson was released, he encountered C.M., a childhood friend. When the topic of defendant arose, C.M. purportedly told Jameson that the alleged sex offense had not happened to him but that it did happen to someone younger than him. C.M. added that he felt that he "needed to step up to the plate." Defendant's attorney added that she was unsure whether she wanted to call Jameson as a witness, because his testimony could potentially harm defendant. The court suggested that each side file a motion if needed to address the issue.

¶ 6     At the final pretrial conference, defendant's attorney made a proffer regarding her decision not to call Jameson. According to defendant's attorney, she had met with Jameson a few months earlier and spent considerable time with him. Defendant interrupted and asked to proceed at trial *pro se* because he did not agree with counsel's decision not to call Jameson. Defendant's attorney explained that Jameson told her that C.M. told him that "nothing happened between [he and

defendant] but [defendant] ha[d] molested multiple kids." The trial court allowed defendant to proceed *pro se*.

¶ 7    The following facts were presented at the trial. In late 2010 and early 2011, C.M. was about 15 years old. In 2010, he met defendant at defendant's restaurant in Dixon. They began to communicate on Facebook. Defendant invited C.M. to the restaurant to eat. C.M. would hang out there, play chess, and talk with defendant. Later, he and defendant would hang out at each other's homes, smoke cannabis, play chess, watch television, and play video games.

¶ 8    Sometime between Thanksgiving and Christmas of 2010, defendant and C.M. were watching television in the basement at C.M.'s home. C.M. sat on a love seat and defendant sat on a nearby sofa. At one point, defendant sat next to C.M. and began rubbing C.M.'s thigh. C.M. froze and did not tell him to stop. Defendant then began rubbing C.M.'s groin. C.M. remained frozen. Then defendant pulled down C.M.'s pants and underwear. C.M. was completely frozen and did not know what to do. Defendant then sucked C.M.'s penis for about 15 to 30 seconds. C.M. then "snapped out of it and told [defendant] to stop." Defendant stopped and returned to the sofa. After C.M. went to the bathroom to gather himself, he returned, and he and defendant continued watching television. However, they kept to themselves after that.

¶ 9    In January 2011, when C.M was at defendant's restaurant, C.M. met an employee named Jodi Remmers. At one point, Remmers asked C.M. if he was in a relationship with defendant. C.M. denied that he was, because he was embarrassed.

¶ 10    Shortly after the conversation with Remmers, the police contacted C.M. He told them about the oral-sex incident with defendant.

¶ 11    For a time, C.M. distanced himself from defendant. But C.M. began spending time again with defendant. According to C.M., defendant bribed him to "basically lie and say it didn't

happen." Defendant planned to sue the county for false arrest and would give C.M. 25 % of any recovery in exchange for denying that the incident had occurred. Defendant proposed that plan to C.M. several times.

¶ 12 C.M. reported defendant's plan to the Dixon police. The police arranged to have C.M. meet with defendant at a pizza place in nearby Amboy. Defendant arrived and met C.M. While C.M. went to the bathroom, defendant looked at C.M.'s phone and then abruptly left.

¶ 13 During cross-examination, defendant asked C.M. if, during the summer of 2011, he had "a reason to speak with somebody named James Jameson?" C.M. answered no. Defendant then asked if he had "a reason in the summer of 2011 at the Peoria bridge to have a conversation with James Jameson regarding this case?" C.M. answered no.

¶ 14 Jodi Remmers worked as a cook at defendant's restaurant from July 2010 until it closed in 2011. In December 2010, defendant told Remmers that he had a new boyfriend. He added that he loved him and that they were spending a lot of time together. Defendant also told her about having oral sex with his boyfriend. At that time Remmers did not know who the boyfriend was. Sometime later, defendant told Remmers that C.M. was his boyfriend. According to Remmers, C.M. would frequent the restaurant daily after school. One day outside the restaurant, Remmers asked C.M. outside the restaurant whether he was dating defendant, and C.M. said no. After C.M. entered the restaurant, defendant approached Remmers and asked why she had asked C.M. about dating him, because no one was supposed to know. Remmers told him that she wanted to know because she did not agree with it. She told defendant that she did not want to hear about his anal sex with C.M.. According to Remmers, when high school boys would walk past the restaurant, defendant would say that they were cute.

¶ 15   On January 21, 2011, Sergeant Matt Richards, along with Detective Andy Oros of the Dixon Police Department, interviewed C.M. at the police station. C.M.'s mother gave them permission to do so and accompanied C.M. to the station. Initially, C.M. denied any sexual relationship with defendant. Sergeant Richards determined, based on C.M.'s behavior, that he was not being truthful during the interview, because he was embarrassed. After he assured C.M. that he was not in trouble, C.M. described the incident in which defendant performed oral sex. That was the only sexual incident that C.M. reported during the interview.

¶ 16   Nicholas Albert, a former detective with the Dixon Police Department, along with other officers, searched defendant's home. In doing so, they found digital media containing videos and still photos of child pornography. The vast majority involved underage boys engaged in sex acts with adult males. During cross-examination, defendant questioned Albert about whether defendant knowingly possessed the child pornography. The trial court cautioned defendant that the line of questioning would allow the State to introduce his conviction for child pornography. Defendant persisted in doing so, and the State was allowed to introduce defendant's conviction.

¶ 17   On February 25, 2014, Detective Jessica Friday of the Dixon Police Department met with C.M., who told her that defendant, who was prohibited from doing so as a condition of bail, had been contacting C.M. Detective Friday obtained an overhear order. Pursuant to that order, she arranged to have C.M. wear a recording device and to meet with defendant at a pizza place.

¶ 18   On March 3, 2014, C.M. met with defendant as arranged. Detective Friday and Sergeant Richards conducted surveillance outside the restaurant. They also monitored any conversations between C.M. and defendant. After C.M. entered the restaurant, they saw defendant approach on foot. He looked through the restaurant windows before entering. Defendant asked to see C.M.'s cell phone. When C.M. attempted to discuss defendant's offer to pay C.M. to lie about the incident,

defendant indicated that he felt that there were law enforcement officers in the restaurant and that they should not talk about that in public. After several minutes of conversation, defendant abruptly exited the restaurant.

¶ 19    On cross-examination, Detective Friday admitted that, during the conversation in the restaurant, she never heard defendant offer anything to C.M. for not cooperating with the prosecutor. Nor did C.M. ever offer to testify untruthfully.

¶ 20    After the State rested, it moved to bar Jameson from testifying about C.M.'s statement that nothing had happened between defendant and him. The State contended that defendant had not laid the proper foundation to admit a prior inconsistent statement. The State also argued that defendant should not be allowed to call C.M. to testify again to lay the foundation. The trial court granted the State's motion.

¶ 21    Detective Oros testified in defendant's case in chief. According to him, on January 21, 2011, he interviewed Remmers about a possible relationship between defendant and a 15-year-old boy. Based on that interview, Detective Oros obtained permission from C.M.'s mother to interview him. Detective Oros described C.M. as uncomfortable and embarrassed during the interview.

¶ 22    Jennifer Kolb, a sanitarian for the Lee County Health Department, testified that on January 20, 2011, she conducted a routine health inspection of defendant's restaurant. After viewing an interaction between defendant and C.M. she had a "weird vibe." At one point she saw defendant put his hand on C.M.'s leg. As a mandated reporter of abuse, she thereafter called the Dixon police.

¶ 23    Defendant testified and denied having any sexual relationship with C.M.  He described himself as a mentor to C.M., who was like a little brother.  Defendant also denied offering C.M. anything in exchange for not cooperating with the prosecution.

¶ 24    In rebuttal, the State introduced defendant's child pornography conviction.

¶ 25    Jury deliberations began at 5:33 p.m. on April 26, 2018.  At 7:10 P.M., the jury sent a note asking for the recording and report of C.M.'s initial police interview.  The trial court responded that neither was admissible evidence and that the jury should continue to deliberate.  At 9:10 p.m., the jury sent another note stating that it was divided, with nine voting guilty and three voting not guilty.  By agreement, the court dismissed the jury for the evening and instructed them to continue deliberating the next morning at 9 a.m.  At 11:05 a.m., the jury sent another note stating that it was at an impasse with ten voting guilty and two voting not guilty.  By agreement of the parties, the court gave a *Prim* instruction.  See *People v. Prim*, 53 Ill. 2d 62 (1972).  At around noon, the jury returned a guilty verdict.

¶ 26    Defendant filed a motion for a new trial, asserting among other things, that the trial court erred in barring him from calling Jameson to impeach C.M. and in prohibiting him from recalling C.M. to lay a proper foundation for doing so.  The court denied the motion.

¶ 27    The trial court sentenced defendant to five years' imprisonment to be served consecutive to his child-pornography sentence.  After the court denied his motion to reconsider sentence, defendant filed a timely notice of appeal.

¶ 28                                    II. ANALYSIS

¶ 29    On appeal, defendant contends that the trial court (1) denied him a fair trial when it barred him from calling Jameson to testify about C.M's prior inconsistent statement, and (2) abused its discretion in prohibiting him from recalling C.M. to lay the proper foundation.  The State responds

that the court did not abuse its discretion in barring the prior inconsistent statement or prohibiting defendant from recalling the victim, and in any event, any error was harmless.

¶ 30   A criminal defendant is constitutionally guaranteed a meaningful opportunity to present a complete defense. *People v. Burgess*, 2015 IL App (1st) 130657, ¶ 133. The standard for reviewing whether an individual's constitutional rights have been violated is *de novo*. *People v. Burns*, 209 Ill. 2d 551, 560 (2004). However, when a defendant claims that improper evidentiary rulings violated his constitutional right to present a complete defense, the standard of review is abuse of discretion. *Burgess*, 2015 IL App (1st) 130657, ¶ 133 (citing *People v. McCullough*, 2015 IL App (2d) 121364, ¶ 104)).

¶ 31   The exclusion of evidence is within the sound discretion of the trial court, and a reviewing court will not reverse the trial court absent a showing of an abuse of that discretion. *People v. Becker*, 239 Ill. 2d 215, 234 (2010). That standard applies to motions *in limine* and the scope of cross-examination. *Burgess*, 2015 IL App (1st) 130657, ¶ 134. An abuse of discretion occurs when no reasonable person would take the view adopted by the trial court. *Burgess*, 2015 IL App (1st) 130657, ¶ 134. The trial court's ruling will not be overturned unless the abuse of discretion led to a manifest prejudice against the defendant. *Burgess*, 2015 IL App (1st) 130657, ¶ 134.

¶ 32   Although hearsay is generally inadmissible, there is an exception that allows prior inconsistent statements of a testifying witness to impeach that witness's credibility. *People v. Wilson*, 2012 IL App (1st) 101038, ¶ 38. Before a witness can be impeached with his prior inconsistent statement, a proper foundation must be laid. *Burgess*, 2015 IL App (1st) 130657, ¶ 137. The foundation is satisfied by presenting to the witness the place, circumstances, and substance of the earlier statement. *Burgess*, 2015 IL App (1st) 130657, ¶ 137. The reason for presenting the substance of the earlier statement is to avoid unfair surprise and to give the witness

an opportunity to explain the inconsistency. *Burgess*, 2015 IL App (1st) 130657, ¶ 137 (citing *People v. Smith*, 78 Ill. 2d 298, 304-05 (1980)).

¶ 33    Here, when defendant cross-examined the victim, C.M., he asked him if, during the summer of 2011, he had reason to speak to Jameson. When C.M. answered no, defendant asked him if he had any reason in the summer of 2011 at the Peoria bridge to have a conversation with Jameson about the case. C.M. again responded no. However, defendant never asked C.M. about the substance of any statements that C.M. might have made to Jameson, including any denial that defendant had abused C.M. Because defendant failed to do so, C.M. was never given an opportunity to explain any prior inconsistent statement and would have been subjected to unfair surprise had the trial court allowed defendant to impeach C.M. via Jameson's testimony.

¶ 34    Defendant, relying on *People v. Henry*, 47 Ill. 2d 312 (1970), contends that he laid an adequate foundation, because C.M.'s denial that he had any conversation with Jameson during the summer of 2011 made questioning about the substance of the prior inconsistent statement futile. We disagree.

¶ 35    In *Henry*, the defendants attempted to lay a foundation to impeach a key witness with prior inconsistent statements the witness made to several others. *Henry*, 47 Ill. 2d at 319-20. When initially asked whether she had conversations with the other people, the witness denied knowing two of them and having any conversation with the other. *Henry*, 47 Ill. 2d at 319. Therefore, the defendants never asked the witness about the substance of the statements. When the defendants attempted to introduce the witness's prior inconsistent statements to the other people, the trial court barred them from doing so, because the defendants never completed the foundation by asking about the substance of the statements. *Henry*, 47 Ill. 2d at 320.

¶ 36    Acknowledging that a proper foundation must be laid, including asking the witness about the substance of the prior inconsistent statement, the supreme court held that, "under the circumstances of [the] case," the foundation was adequate to permit the defendants to attempt to impeach the witness. *Henry*, 47 Ill. 2d at 321-22. In so holding, the supreme court explained that the questions propounded to the witness substantially satisfied the reasons for the rule requiring a foundation. *Henry*, 47 Ill. 2d at 322.

¶ 37    Because *Henry* was decided on its unique facts, it does not control in this case. Indeed, in *People v. Smith*, 78 Ill. 2d 298 (1980), the defendant relied on *Henry* in contending that, because the witness had denied making any prior statement, it was unnecessary to ask the witness about the substance of the prior statement. *Smith*, 78 Ill. 2d at 305. The *Smith* court held that *Henry* was distinguishable, because in *Henry* the foundational requirements were substantially satisfied when the defendants asked the witness "specifically regarding the statement that she had given to the police during the investigation of the subject crime." *Smith*, 78 Ill. 2d at 305; see also *Burgess*, 2015 IL App (1st) 130657, ¶ 139. In *Henry*, because the witness was alerted to the substance of her prior remark, the element of unfair surprise was eliminated. *Smith*, 78 Ill. 2d at 305. However, in *Smith*, the defendant asked the witness only generally if, while at the jail, he had spoken to the impeacher about the defendant's case. *Smith*, 78 Ill. 2d at 305. Thus, the supreme court held that the foundation was too general, and thus inadequate, to qualify under the *Henry* exception. *Smith*, 78 Ill. 2d at 305.

¶ 38    Here, the foundation was nearly identical to the one held inadequate in *Smith*. Defendant merely asked C.M. generally if, during the summer of 2011, he had a conversation with Jameson about the case. Unlike in *Henry*, defendant never suggested to C.M. the substance of any prior

inconsistent statement. Thus, the narrow exception recognized under the particular circumstances in *Henry* does not apply here.

¶ 39    Defendant suggests that *Henry* eliminated the long-standing foundational requirement that a defendant ask the witness about the substance of a prior inconsistent statement. We do not interpret *Henry* as doing so. In *Henry*, the supreme court noted that its holding was based on the particular facts of that case. *Henry*, 47 Ill. 2d at 322. Further, in *Smith*, the supreme court did not interpret *Henry* as eliminating the foundational requirement, but merely relaxing it where the unique circumstances resulted in the foundational requirement being substantially satisfied. *Smith*, 78 Ill. 2d at 305. Finally, to the extent that *People v. McIntosh*, 70 Ill App. 3d 188 (1979), held that, to have a proper foundation, *Henry* requires a witness to either be confronted with the substance of the prior statement or deny that any conversation occurred (*McIntosh*, 70 Ill. App. 3d at 194), we respectfully disagree. *Henry* did not eliminate the foundational requirement of asking a witness about the substance of a prior inconsistent statement simply because the witness initially denied that any conversation occurred.

¶ 40    Based on the foregoing, the trial court did not abuse its discretion in ruling that defendant failed to lay the necessary foundation for admission of C.M.'s prior inconsistent statement.

¶ 41    Alternatively, defendant asserts that, relying on *People v. Cobb*, 97 Ill. 2d 465 (1983), the trial court abused its discretion in refusing to allow him to recall C.M. to complete the foundation by asking C.M. about the substance of the prior statement to Jameson. *Cobb*, however, does not support defendant's argument.

¶ 42    In *Cobb*, the defendants sought to recall the State's witness, Santini, to lay a foundation for the introduction of a prior inconsistent statement. *Cobb*, 97 Ill. 2d at 477. The supreme court characterized Santini as the State's most important witness, whose testimony, if believed, was

sufficient to convict the defendants. *Cobb*, 97 Ill. 2d at 478. Accordingly, the prior inconsistent statement could have "seriously damage[d] the State's case." *Cobb*, 97 Ill. 2d at 478. The prior inconsistent statement also supported the defendants' theory that Santini committed the crimes. *Cobb*, 97 Ill. 2d at 478. The supreme court also noted that the defendants were prohibited from recalling another witness for purposes of laying a foundation regarding another prior inconsistent statement of Santini. *Cobb*, 97 Ill. 2d at 479-81. Further, the supreme court commented that, because it was a capital case, the defendants' lives were at stake. *Cobb*, 97 Ill. 2d at 478. Thus, the supreme court held that the prohibition on admission of both of Santini's prior inconsistent statements, combined with the failure to give an accomplice instruction, required reversal for a new trial. *Cobb*, 97 Ill. 2d at 481.

¶ 43　However, the circumstances here are far less egregious than those in *Cobb*. Here, C.M., was the victim, but the State offered other significant evidence. That evidence consisted of defendant's statements to Remmers that he was dating C.M. and had engaged in oral sex with C.M., defendant's possession of child pornography involving young boys and adult males, and C.M.'s testimony that defendant had offered to compensate him in exchange for C.M. not cooperating with the prosecution. The jury also heard Kolb's testimony that she saw defendant touch C.M.'s leg and that she reported possible abuse to the police because she had such a weird feeling when she saw the two together. Unlike in *Cobb*, there was substantial evidence apart from C.M.'s testimony about defendant performing oral sex on him that established defendant's guilt.

¶ 44　Further, unlike in *Cobb*, Jameson's proposed testimony about C.M.'s prior inconsistent statement would not have seriously damaged the State's case. See *Cobb*, 97 Ill. 2d at 478. According to defendant's former attorney, Jameson told her that, although C.M. denied any sexual involvement with defendant, C.M. did say that defendant had been sexually involved with other

young people. Had Jameson been allowed to testify about his conversation with C.M., any benefit from C.M.'s prior inconsistent statement likely would have been negated by his statement that defendant had molested other young people.

¶ 45    Finally, in *Cobb*, a capital case, there were two witnesses who would have testified to prior inconsistent statements of the State's key witness, one of which would have implicated the State's witness. Here, C.M. allegedly made one prior inconsistent statement to a single person and that statement did not implicate C.M. or anyone else. Nor was this a capital case. Because the facts in *Cobb* were far more compelling for the defense than those here, *Cobb* is distinguishable and does not support a reversal of defendant's convictions in this case.

¶ 46    Based on the foregoing, we conclude that the trial court did not abuse its discretion in prohibiting defendant from recalling C.M. to lay the proper foundation to admit C.M.'s prior inconsistent statement.

¶ 47    Even if we held that the trial court abused its discretion in barring Jameson from testifying about C.M.'s prior inconsistent statement, or in prohibiting defendant from recalling C.M. to lay the proper foundation, any such error would have been harmless. See *People v. Ramos*, 2018 IL App (1st) 151888, ¶ 24 (an evidentiary error is harmless where there is no reasonable probability that the jury would have acquitted the defendant absent the error).

¶ 48    As discussed, there was substantial evidence, independent of C.M.'s testimony that defendant performed oral sex, to support the jury's verdict. Remmers testified that defendant told her that his new boyfriend was C.M. and that he had oral sex with him. Kolb testified that she saw defendant touch C.M.'s leg and that she had such a weird feeling that immediately after her visit to the restaurant she reported her suspicion to the police. Defendant also told Remmers that he was unhappy that she had talked to C.M. about their relationship. Further, defendant's attempts to

persuade C.M. not to cooperate with the prosecution in exchange for monetary compensation showed defendant's consciousness of guilt. See *People v. Gwinn*, 366 Ill. App. 3d 501, 516-17 (2006). Additionally, defendant possessed child pornography involving young males. That evidence collectively supported the jury's verdict.

¶ 49    Additionally, Jameson's proposed testimony would not have necessarily helped defendant. C.M. admitted that he initially denied to the police that anything sexual had happened between him and defendant. Sergeant Richards and Detective Oros each testified that they believed that C.M. initially denied defendant's conduct because C.M. was uncomfortable and embarrassed. Indeed, C.M. described the incident in the basement only after the officers assured C.M. that he was not in trouble. Because he was embarrassed, C.M. also denied to Remmers that anything sexual happened. Given C.M.'s exhibited embarrassment, his denial to Jameson, a childhood friend, about the sexual conduct of defendant was understandable.

¶ 50    More importantly, as discussed, Jameson's testimony likely would have harmed defendant as much as helped him. Had Jameson testified, the State surely would have elicited his testimony that C.M. told him that defendant had molested other kids. Indeed, defendant's former attorney told the trial court that the damaging testimony was why she had opted not to call Jameson. The other evidence of defendant's guilt, combined with the weak benefit of Jameson's testimony, establishes there is no reasonable probability that the jury would have acquitted defendant had the trial court allowed defendant to recall C.M. to lay the proper foundation and to permit Jameson to testify. Thus, any error was harmless.[1]

_____

[1] Although defendant points to the jury deliberations and the notes, including two that indicated that the jury was split, that does not show that the evidence was closely balanced. See

¶ 51                                    III. CONCLUSION

¶ 52    For the reasons stated, we affirm the judgment of the circuit court of Lee County.

¶ 53    Affirmed.

---

*People v. Nugen*, 399 Ill. App. 3d 575, 584 (2010); *People v. Minniweather*, 301 Ill. App. 3d 574, 580 (1998); see also *People v. Sullivan*, 2011 IL App (4th) 100005, ¶¶ 24-26 (attempts to evaluate the strength of the evidence by assessing a jury's conduct during deliberations ignore that it is impermissible to impeach a verdict with evidence of the jury's motive, method, or process of deliberation).