2020 IL App (1st) 162636-U

SIXTH DIVISION
June 26, 2020

No. 1-16-2636

NOTICE: This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 10 CR 18156 |
| | ) | |
| SAMUEL GAYDEN, | ) | Honorable |
| | ) | Domenica A. Stephenson, |
| Defendant-Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE MIKVA delivered the judgment of the court.
Justices Cunningham and Connors concurred in the judgment.

**O R D E R**

¶ 1    *Held*:  Convictions affirmed where (1) admission of DNA evidence was not an abuse of discretion, (2) opinion identification testimony of three witnesses was properly admitted, (3) prior inconsistent statements of a witness were properly admitted as substantive evidence, and (4) defendant did not receive ineffective assistance of counsel.

¶ 2    Defendant Samuel Gayden was convicted by a jury of two first degree murders and one attempted first degree murder. He was sentenced to natural life in prison for the murders and 20 years for the attempted murder. On appeal, Mr. Gayden argues that he was deprived of a fair trial

because the trial court erred by (1) allowing the State to use DNA evidence to tie Mr. Gayden to the gun used in the shootings and letters sent from the jail, (2) allowing three witnesses to identify him on surveillance video even though they did not witness the shooting, and (3) allowing the State to present the prior statements of a witness. Mr. Gayden also argues that he received ineffective assistance of trial counsel. For the following reasons, we affirm.

¶ 3                                I. BACKGROUND

¶ 4      Just after midnight on September 1, 2010, three men were shot while inside State Garden Food & Liquors in Chicago, Illinois. Two of them—Marcus Marshall and Shawntelle Harris—died. The shooting was caught on the store's surveillance cameras. Mr. Gayden was tried for first degree murder with respect to Mr. Marshall and Mr. Harris, and attempted murder with respect to the third man, Chauncey Williams.

¶ 5                         A. Pre-Trial Motions and Rulings

¶ 6      Mr. Gayden filed numerous motions prior to trial. The following motions are relevant to this appeal.

¶ 7                       1. Motions to Bar Witness Identifications

¶ 8      Mr. Gayden sought to bar Akram Jaber, Lolita Garnett, Brian Murdock, Sergeant Jose Lopez, and Chauncey Williams from identifying him on the surveillance videos because they did not observe the shooting.

¶ 9      At the hearing, the State had agreed that Mr. Jaber and Ms. Garnett would not identify Mr. Gayden on the surveillance video. The court ruled, over Mr. Gayden's objection, that they could testify as to what was in the video because they were present at the time of the shooting. The court also ruled that Mr. Murdock would be permitted to identify Mr. Gayden in the video because he was familiar with Mr. Gayden. The court then held a separate hearing to determine whether

2

Sergeant Lopez would be allowed to identify Mr. Gayden in the video.

¶ 10    At that hearing, Sergeant Lopez testified that he had known Mr. Gayden as "Duke" since 2007 from the neighborhood, had spoken to Mr. Gayden "a half a dozen times," and was present when Mr. Gayden was arrested for an unrelated offense in 2007.

¶ 11    The trial court concluded that Sergeant Lopez could identify Mr. Gayden in the video because "Sergeant Lopez had sufficient knowledge of [Mr. Gayden] and [Mr. Gayden]'s appearance prior to the incident that is depicted in the video."

¶ 12                      2. Motion to Bar DNA Evidence from the Envelope

¶ 13    Mr. Gayden sought to bar DNA evidence as to the testing done on two letters sent from jail—purportedly by Mr. Gayden. The State had filed a motion to introduce the letters as evidence of other crimes and argued the letters were relevant to show Mr. Gayden's consciousness of guilt. Mr. Gayden argued that the results of the DNA testing were "too incomplete and fragmented for any conclusions as to identity to be made."

¶ 14    At the hearing on the motion, Dr. Karl Reich testified as an expert for Mr. Gayden. The doctor explained that there are 13 chromosome regions that can be analyzed in DNA testing, called "loci," but that there is no standard number of loci that need to match in order to make an identification. Dr. Reich testified that according to the Illinois State Police (ISP) lab, one envelope did not yield enough results for comparison. For the other envelope, the lab described receiving results from six loci and a "sex locus," which was used to determine that the letter came from a man. Dr. Reich explained that the ISP lab compared four of the six loci to a sample collected from Mr. Gayden. According to Dr. Reich, four loci was "not sufficient genetic identification information to provide any conclusion on identity." Dr. Reich acknowledged that Mr. Gayden could not be excluded as a contributor and that the report concluded that approximately 1 in 6.2

million black individuals could not be excluded from having contributed to the DNA profile.

¶ 15    The trial court denied Mr. Gayden's motion, finding that his objections went to the weight of the evidence, rather than admissibility.

¶ 16         3. Motion *In Limine* to Bar DNA Evidence from the Recovered Gun

¶ 17    Mr. Gayden also filed a motion *in limine* to bar two DNA reports from swabs taken from a gun recovered by the police from where he lived at the time during their investigation. The first DNA report stated that the low-level DNA profile identified did not "contain enough information to either exclude or imply positive association to Samuel Gayden." The second report, completed approximately four years later, employed a different method of quantifying DNA comparisons and concluded that Mr. Gayden "c[ould] not be excluded," and gave a probability that "one in four black, one in three white, [and] one in four Hispanic" individuals could also not be excluded.

¶ 18    The trial court denied this motion as well, finding that the probative value of the DNA results outweighed any prejudicial effect.

¶ 19                    4. Mr. Jaber's Identification Testimony

¶ 20    Just before *voir dire* of the jury began on May 16, 2016, the State indicated that it, in fact, did want Mr. Jaber to identify Mr. Gayden on the surveillance video. Defense counsel responded that, under the recent supreme court decision in *People v. Thompson*, 2016 IL 118667, a hearing was necessary prior to his testifying. The court agreed to a hearing but said, prior to the hearing, that it would allow Mr. Jaber to identify Mr. Gayden in the video if the evidentiary hearing confirmed what the State had indicated Mr. Jaber would say.

¶ 21    At the evidentiary hearing, Mr. Jaber was shown a still from the video surveillance and said that he recognized the shooter as one of the store's regular customers who had come in "[a]lmost daily" for "a long time, maybe five" years. Mr. Jaber said that he observed that person

4

inside the store right before the shooting occurred. Mr. Jaber also identified a photograph of Mr. Gayden from the time of his arrest as the shooter from the video. Mr. Jaber said, however, he was not able to identify the person from the photographs in the courtroom.

¶ 22    The trial court ruled that Mr. Jaber would be permitted to testify to Mr. Gayden's identity on the surveillance video, as it found Mr. Jaber had "general familiarity with [Mr. Gayden], the person depicted in the video that he says is a customer or was a customer on a daily basis." The court said it would give a limiting instruction to the jury before Mr. Jaber's testimony. Mr. Gayden's counsel agreed to the jury instruction offered by the State.

¶ 23    Just before Mr. Jaber was called to testify, the State notified the court outside the presence of the jury that Mr. Jaber had disclosed that he recognized Mr. Gayden in court and, in fact, would also make an in-court identification of him. Defense counsel declined the offer to question Mr. Jaber about his identification before he testified.

¶ 24                                    B. Trial

¶ 25    The surviving victim, Mr. Williams, testified that, in the early morning of September 1, 2010, he went to the liquor store with Mr. Marshall and Mr. Harris. After about five minutes, two men entered the store—one wearing a black t-shirt and shorts, the other a white sleeveless shirt. Mr. Williams testified that he was face-to-face with the man in the black t-shirt at some point and noticed the man had "twists, braids or something like that" in his hair. Mr. Williams identified Mr. Gayden in court as that man, noting that he looked different because he was wearing glasses, did not "have the braids," and looked "a little slim."

¶ 26    Soon after, Mr. Williams saw the door "bust open" and heard shots ring out. Mr. Williams testified that Mr. Gayden was the shooter and saw him shoot Mr. Marshall. Mr. Williams hid behind the ATM. Mr. Williams said Mr. Gayden fired "maybe 14, 15" shots, shooting Mr. Harris

and shooting at, but missing, Mr. Williams. When the police arrived, Mr. Williams told them that he did not see anything. At trial, Mr. Williams explained that "it was not like a fib, but I don't—I don't really talk to no police."

¶ 27    Mr. Williams met with Detective Garza on September 7, 2010, and, eventually, told the detective what he had seen. Mr. Williams then identified Mr. Gayden as the shooter from a photo lineup and also identified the man in the white sleeveless shirt from another photo lineup. Mr. Williams later identified Mr. Gayden as the shooter from an in-person lineup. Clips from the surveillance videos from both inside and outside the store were published to the jury and Mr. Williams narrated what was happening in the videos.

¶ 28    Mr. Jaber testified that he was the manager of the liquor store in September 2010. He was working at approximately 12:40 a.m. on September 1, 2010, when he heard gunshots at the store entrance about 15 feet away. Mr. Jaber threw himself to the ground and did not see the shooter. When the police arrived, Mr. Jaber showed them the surveillance videos and the State published photo stills from those videos. Over Mr. Gayden's objection, Mr. Jaber testified that he knew the man in the black t-shirt in the photo still as a regular customer prior to September 2010 with whom he had numerous interactions. Mr. Jaber testified that he identified a photo of Mr. Gayden as that man in a photo lineup on September 11, 2010, and identified another photo of Mr. Gayden as the man in the black t-shirt.

¶ 29    On cross-examination, Mr. Jaber acknowledged that he did not witness the shooting when it happened and did not identify anyone in the courtroom as the man in the black t-shirt at a hearing that took place earlier that day. On redirect, however, Mr. Jaber said that when he was testifying at the earlier hearing, "it dawned on me that it's him. He changed his appearance from the way I used to know him, the way he dressed. He didn't have glasses. He used to have cornrows in his

head." Mr. Jaber then identified Mr. Gayden in court as the man in the black t-shirt on the video.

¶ 30    Sergeant Lopez was assigned to investigate the shooting and testified that he had spoken with Mr. Gayden approximately six times before September 2, 2010. Sergeant Lopez identified Mr. Gayden in the video as the shooter. Sergeant Lopez noted "[Mr. Gayden] obviously had a haircut since [the shooting]. He's wearing glasses. He's lost, it looks like, quite a bit of weight since then." Sergeant Lopez identified the man wearing the white sleeveless shirt in the video as Brian Murdock. Sergeant Lopez testified that, on September 11, 2010, Mr. Murdock went to the police station and spoke with Detective Garza. At approximately 1 a.m. on September 12, 2010, Sergeant Lopez and other officers went to the apartment complex where Mr. Gayden lived and arrested him. Echo Johnson, who also lived in the apartment, consented to a search of it. During the search, a .45-caliber semiautomatic pistol was found inside of an access panel in a bedroom closet and swabbed for DNA.

¶ 31    Brian Murdock testified that he was present for the shooting at the liquor store on September 1, 2010. He said that he went to the store alone and was kicked out by the owner of the store after he asked for change. Mr. Murdock testified that when he was walking out of the store, he heard gunshots and ran away down the alley. He testified that he did not know Mr. Gayden and did not know anyone nicknamed "Duke." However, when Mr. Murdock was shown a picture of Mr. Gayden, he said he recognized Mr. Gayden. He acknowledged that he was the man in the white sleeveless shirt seen in the video.

¶ 32    Mr. Murdock admitted in his testimony that he had told Assistant State's Attorney (ASA) John Carroll, when he had gone to the police station on September 11, 2010, that he was friends with Mr. Gayden, that Mr. Gayden came running to the car he was in after the shooting, that he and Mr. Gayden went to a park to drink alcohol after the shooting, and that he identified Mr.

7

Gayden on the video as the man who he walked into the store with. Mr. Murdock also acknowledged that, on April 30, 2011, he met with ASA Jose Villarreal at the police station and gave a written statement about the shooting, signing every page.

¶ 33     Mr. Murdock testified that he was so high when he spoke to the ASAs in 2010 and 2011 that he had no idea what he said to them. He also claimed that everything he told the ASAs was because Detective Garza threatened him. Mr. Murdock acknowledged that he had prior felony convictions from 2002, 2003, and 2004, and that at the time of trial he was serving time for being an armed habitual criminal.

¶ 34     When the State sought to publish Mr. Murdock's written statement, Mr. Gayden's counsel requested that "the impeachment *** be limited to the portions of the handwritten [statement] that he denied making." The trial court denied the request and ruled that the State would be permitted to publish the whole statement, reasoning that although Mr. Murdock admitted to making the statements, "he always qualified it" by saying he was high and he had been threatened.

¶ 35     ASA Carroll and ASA Villareal both testified that that Mr. Murdock did not appear to be under the influence of drugs or alcohol when they met with him and that Mr. Murdock never indicated that he had been threatened by Detective Garza. ASA Carroll showed Mr. Murdock three surveillance videos from inside the liquor store, and outside in front and on the side of the store. Mr. Murdock identified himself and Mr. Gayden in all three videos. Mr. Murdock told the ASA that he had gone to the liquor store with a group that included Mr. Gayden and that he stayed outside when Mr. Gayden entered the store. ASA Carroll testified that Mr. Murdock told him that Mr. Gayden then came running outside and told Mr. Murdock that "someone was shooting."

¶ 36     ASA Villarreal testified that he took Mr. Murdock's written statement, reviewed the statement with Mr. Murdock, and had Mr. Murdock sign each page. Mr. Murdock's statement was

8

then published to the jury.

¶ 37    According to Mr. Murdock's written statement, early in the morning of September 1, 2010, he and eight friends—including Mr. Gayden—went in two separate cars to the liquor store. Mr. Murdock stated that the surveillance video from outside of the store showed Mr. Murdock and Mr. Gayden together just before Mr. Gayden entered the store a second time. After Mr. Gayden went into the store the second time, Mr. Murdock immediately heard gunshots and then saw Mr. Gayden running from the liquor store to the car he had arrived in. Mr. Murdock identified Mr. Gayden on the surveillance videos entering the store the second time and shooting. Mr. Murdock said that the group all went to Mr. Gayden's house after the shooting. Mr. Murdock also said in his statement that he had been treated well by the police and that he was not under the influence of drugs or alcohol.

¶ 38    Chicago police detective Anthony Padilla testified that he met with a woman named Jean Walker at approximately noon on September 1, 2010, because Ms. Walker had contacted 3-1-1 to say that she "had text messages from her ex-boyfriend Harvey Wilkins concerning a shooting in which two people were shot." Detective Padilla photographed the text messages, which were published to the jury. Mr. Wilkins first texted Ms. Walker at 4:57 a.m. on September 1, 2010, saying "Wake up i f*** up i need u if i dont need nobody els i just shoot 2 people i need 2 see yall be4 I go. i need a shirt I hav blood on minds[.]" Detective Padilla testified that he showed Ms. Walker a still photograph from the store's surveillance video to determine whether Mr. Wilkins was the shooter, and that after Ms. Walker saw the photograph, Mr. Wilkins was no longer a suspect.

¶ 39    Greg Didomenic, a forensic scientist with the ISP and an expert in the field of forensic DNA analysis, testified that when the DNA swabs from the recovered semiautomatic pistol were

initially tested, the ISP determined that the low-level DNA profile was from a male but that it was considered "incomplete information" and that, at that time, the ISP was only using such incomplete information "for exclusionary purposes." More recently, however, a "statistical calculator" was developed that allowed them to "use that limited information and still apply a frequency of occurrence." Mr. Didomenic testified that this was used to conclude that Mr. Gayden and "approximately one in four black, one in three white or one in four Hispanic unrelated individuals cannot be excluded as having contributed to that DNA type." On cross-examination, Mr. Didomenic acknowledged that the percentages he gave were "not a very strong association," and that "it's likely a lot" of the people in the courtroom "could not be excluded from having contributed to that single DNA type."

¶ 40    Chicago police officer James Vins identified two letters that had been returned to the Cook County jail as undeliverable, dated May 10 and May 16, 2014. Both envelopes had Mr. Gayden's booking number, were addressed to Atia "Ducie" Johnson at the same address, and had the return address with the last name Gayden, at the inmate housing location of division 9, tier 2H, bedding assignment 2261 at 2600 South California Avenue. Both letters were published to the jury.

¶ 41    The May 10 letter said "Jo-Jo and Nitball to stand on that business for me A.S.A.P.," and "n**** getting down on me name Chauncey Williams he stay 5657 S. Michigan 3rd floor left hand side that b**** gotta go A.S.A.P. that why I [*sic*] Jo-Jo or Nitball stand on that situation." The letter also said "I need you to try to find this girl Lolita Garnett on F.B.—I want Lolita to testify on my behalf saying she seen [*sic*] the shooter but it wasn't me and she was scared that why she didn't say shit." The May 16 letter said to "tell broski I said stop f*** playing games with dude my clock running out my auntie got 5,000 bucks for him right now if he get dude out of the way A.S.A.P. him or Nitball."

¶ 42     Lisa Kell, a second ISP expert in the field of forensic DNA analysis, testified that she analyzed swabs from the envelopes for possible DNA comparison. The sample from the May 16 letter did not have DNA suitable for comparison, but she was able to analyze the May 10 sample and found it contained "[a] mixture of human profiles *** and that was interpreted as a mixture of two people." She said the major donor was male and she compared the DNA profile of the major donor to Mr. Gayden's DNA profile. Ms. Kell concluded that Mr. Gayden could not be excluded as a possible contributor and that "[a]pproximately 1 in 6.2 million black, 1 in 2.8 million white, or 1 in 1.5 million Hispanic unrelated individuals cannot be excluded from having contributed to the DNA profile at the five locations." Ms. Kell clarified that saying someone could not be excluded was different than saying someone was a match. She also explained that she did not have enough information to make a definitive statement that Mr. Gayden was the contributor.

¶ 43     Sergeant Lopez testified that he had listened to three phone calls from the jail made in April and May of 2014 and that he recognized Mr. Gayden's voice on each call and Echo Johnson's voice on the May 10 call. In an April 18 call, Mr. Gayden told Joe McSpadden to find Lolita Garnett because Mr. Gayden "need[ed] her to testify" that he was not the shooter. In a May 10 call, Mr. Gayden asked Echo Johnson about "the name and address I had sent you in the mail about dude who getting down on me" and then told her to write down the name and address of Chauncey Williams at 5657 South Michigan Avenue. In a May 23 call, Mr. Gayden talked to Atia Johnson about "Nitball" and asked about the letter he sent her "like two weeks ago" and another "last week."

¶ 44     At this time, the State rested. The trial court denied Mr. Gayden's motion for a directed verdict without argument.

¶ 45     Jean Walker testified on Mr. Gayden's behalf that she had a child with Harvey Wilkins and

that at approximately 4:57 a.m. on September 1, 2010, she was woken up by the text messages from Mr. Wilkins that Detective Padilla had testified about in which Mr. Wilkins said that he had shot two people. Ms. Walker said she called the police the next day. Ms. Walker testified that in January 2016, one of Mr. Gayden's attorneys showed her surveillance video from the night of the shooting. Ms. Walker said that the man on the video had a similar stance to Mr. Wilkins but that the man on the video "was like too big or the hair is off for it to be [Mr. Wilkins]" and that she therefore did not think it was Mr. Wilkins.

¶ 46    Harvey Wilkins also testified for the defense. According to Mr. Wilkins, he initially denied to investigators that he sent the text messages; however, he testified at trial that he did send them because he was trying to get into the house to see his daughter. On cross-examination, Mr. Wilkins testified that he was not at the liquor store at 1 a.m. on September 1, 2010.

¶ 47    The parties stipulated that the only double shooting that occurred on September 1, 2010, was the liquor store shooting. The defense then rested.

¶ 48    After deliberating, the jury found Mr. Gayden guilty of the first degree murders of both Mr. Marshall and Mr. Harris, and of the attempted first degree murder of Mr. Williams.

¶ 49                                C. Post-Trial Proceedings

¶ 50    Mr. Gayden filed a motion for new trial, arguing that the trial court erred by denying his motion to bar the identification testimony of Mr. Jaber and Sergeant Lopez, denying his motions to bar the DNA evidence, and allowing the State to introduce the prior statements of Mr. Murdock. After hearing argument, the trial court denied the motion.

¶ 51    The trial court sentenced Mr. Gayden to a term of natural life in prison without the possibility of parole for the two murder convictions and 20 years for the attempted murder. Mr. Gayden's motion to reconsider his sentence was denied and this appeal followed.

¶ 52                                    II. JURISDICTION

¶ 53    Mr. Gayden's motion to reconsider sentence was denied on September 13, 2016, and he timely filed his notice of appeal that same day. We have jurisdiction pursuant to article VI, section 6 of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6), and Illinois Supreme Court Rule 603 (eff. Feb. 6, 2013) and Rule 606 (eff. Dec. 11, 2014), governing appeals from final judgments of conviction in criminal cases.

¶ 54                                    III. ANALYSIS

¶ 55    On appeal, Mr. Gayden argues that he was deprived of a fair trial because (1) the trial court erred when it allowed the State to use DNA evidence to tie Mr. Gayden to both the gun and the letters sent from the jail; (2) the trial court should not have permitted the identification testimony of Sergeant Lopez, Mr. Jaber, and Mr. Murdock; (3) the trial court erred when it let the State present the prior statements of Mr. Murdock by ASA Carroll and ASA Villarreal; and (4) Mr. Gayden received ineffective assistance from his trial counsel. We consider each issue in turn.

¶ 56         A. The Admission of the DNA Evidence Was Not an Abuse of Discretion

¶ 57    The trial court's ruling on the admission of evidence is generally reviewed for an abuse of discretion. *People v. Harvey*, 211 Ill. 2d 368, 392 (2004). "An abuse of discretion will be found only where the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." *People v. Caffey*, 205 Ill. 2d 52, 89 (2001).

¶ 58    According to Mr. Gayden, the DNA comparison result from the gun was "so skimpy that statistically it would only eliminate a portion of the jury from having committed the instant offense" and was therefore irrelevant. As to the DNA evidence from the envelope, Mr. Gayden argues that it was far more prejudicial than probative because it "showed the same DNA was twice as likely to be from a white male and four times more likely to be from a Hispanic male." The

State, in turn, argues that the DNA evidence was, in fact, "unquestionably relevant and admissible."

¶ 59    "Relevant evidence is evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable than it would be without the evidence." *Harvey*, 211 Ill. 2d at 392. "Probability is probability 'tested in the light of logic, experience, and accepted assumption as to human behavior.' " *People v. Pike*, 2016 IL App (1st) 122626, ¶ 33 (quoting *People v. Patterson*, 192 Ill. 2d 93, 115 (2000)).

¶ 60    Although " '[r]elevance is a threshold requirement [for admissibility] that must be met by every item of evidence,' " a court may exclude even relevant evidence "if the prejudicial effect of the evidence substantially outweighs its probative value." *Id.* ¶ 34 (quoting *People v. Dabbs*, 239 Ill. 2d 277, 289 (2010)). For the reasons outlined below we find that neither of the challenged admissions of DNA evidence was an abuse of discretion.

¶ 61    1. Admission of the DNA Evidence from the Gun was Not an Abuse of Discretion

¶ 62    According to the trial testimony, Mr. Gayden could not be excluded as having contributed to the DNA recovered from the gun and "one in four black, one in three white or one in four Hispanic unrelated individuals" in general could not be excluded from possibly having contributed to the DNA on the gun. While this was hardly conclusive evidence tying Mr. Gayden to the gun, it was not unreasonable for the trial court to conclude that it had "some tendency" to make it more probable that Mr. Gayden had handled the gun that was used in the shooting.

¶ 63    Mr. Gayden relies on *Pike*, 2016 IL App (1st) 122626, which we find to be distinguishable. In *Pike*, this court found the admitted DNA evidence was irrelevant and admitted in error— although not rising to the level of plain error—because the fact that 50% of the population could be a potential contributor to the recovered DNA "did not tend to make [the] defendant's

14

identification more or less probable." *Id.* ¶ 77. Here, in contrast, 1-in-4 black males, or 25% could not be excluded from having contributed to the DNA on the gun, leaving Mr. Gayden in the minority of the population who might have touched the gun. It was not unreasonable for the trial court to conclude that this evidence, albeit of limited value, was admissible.

¶ 64 Mr. Gayden also argues that DNA evidence is inherently prejudicial and that therefore any relevance was outweighed. We would share this concern but for the fact that between his direct testimony and his cross-examination, Mr. Didomenic was clear that the DNA results did not identify Mr. Gayden as having handled the gun and that he was part of a very large group of people who were not excluded, thereby mitigating the potential for prejudice from admitting this evidence.

¶ 65 Mr. Gayden also argues that the State misled the jury as to the weight of this evidence. He points to this portion of the State's argument on rebuttal:

"Recalculation of gun on the DNA [*sic*]. New program, you heard the guy testify. So what do you want? You want to bury our head in the sand and pretend this doesn't exist? What if it would have been an exclusion? What if the new math would have said no, it couldn't have been him. Then you wouldn't [have] heard any complaining, would you?"

¶ 66 According to Mr. Gayden, the State "intentionally confus[ed] the jury by equating the distinct concepts of genetic exclusion and genetic identification." But the State did not argue that the gun identified Mr. Gayden as the DNA contributor, only that if Mr. Gayden had been excluded as a possible contributor to the DNA, he would have wanted that evidence presented at trial. And, in fact, the State highlighted the "admittedly, small numbers" in closing argument, also saying that "[i]t's 1 in 4. There's people in this courtroom right now that could also not be excluded." There was no reversible error in the State's closing argument.

15

¶ 67               2. The DNA from the Envelope was Properly Admitted

¶ 68    For similar reasons, we find no reversible error in the admission of Lisa Kell's DNA testimony about the May 10 envelope. That testimony was that Mr. Gayden could not be excluded as a possible contributor and that only 1 in 6.2 million black, 1 in 2.8 million white, or 1 in 1.5 million Hispanic unrelated individuals also could not be excluded. This is significantly stronger than the DNA evidence about the gun and certainly makes the possibility that Mr. Gayden himself handled the envelope, and therefore the possibility that he authored the letter, more probable than it would be without the evidence.

¶ 69    Defense counsel spent time on her cross-examination of Ms. Kell emphasizing that the DNA evidence was not an identification and the fact that Mr. Gayden could not be excluded did not mean there was a match. The statistic was fully presented, including the fact that a white or Hispanic individual was more likely to not be able to be excluded than a black one. Like the DNA comparison from the gun, the DNA comparison from the envelope was put into its proper context and it was not unduly prejudicial to Mr. Gayden.

¶ 70    Mr. Gayden argues that the State mischaracterized Ms. Kell's statistics in its rebuttal argument, saying "6.2 million to 1 that DNA occurs in the general population of African American individuals" and "Partial profile on the envelope. 6.2 million to 1, we know that." We agree with Mr. Gayden that 6.2 million to 1 is not quite the same as 1 in 6.2 million, but these were two statements amidst 20 pages of closing and 20 pages of rebuttal arguments by the State. Also, the trial court properly instructed the jury, both before and after arguments, that closing arguments are not evidence which, we have recognized, diminishes any possible prejudicial impact of closing argument. *People v. Willis*, 409 Ill. App. 3d 804, 814 (2011).

¶ 71        B. The Admission of the Identifications Was Not an Abuse of Discretion

¶ 72    Mr. Gayden next argues that the trial court erred when it permitted Mr. Jaber, Mr. Murdock, and Sergeant Lopez to identify Mr. Gayden as the shooter in the surveillance video and also erred in its identification instruction to the jury. Evidentiary rulings are reviewed for an abuse of discretion (*Thompson*, 2016 IL 118667, ¶ 53), and the question of whether the applicable law was correctly conveyed by a jury instruction is reviewed *de novo* (*People v. Parker*, 223 Ill. 2d 494, 501 (2006)).

¶ 73                1. The Opinion Identifications Were Properly Admitted

¶ 74    In *Thompson*, 2016 IL 118667, ¶¶50-51, our supreme court held that opinion identification testimony is admissible if "(a) the testimony is rationally based on the perception of the witness and (b) the testimony is helpful to a clear understanding of the witness's testimony or a determination of a fact in issue." *Id.* ¶ 50. The court noted that "[l]ay opinion identification testimony is helpful where there is some basis for concluding the witness is more likely to correctly identify the defendant from the surveillance recording than the jury." *Id.* "A showing of sustained conduct, intimate familiarity, or special knowledge of the defendant is not required. Rather, the witness must only have had contact with the defendant, that the jury would not possess, to achieve a level of familiarity that renders the opinion helpful." *Id.* The court used a totality-of-the-circumstances approach, including the following factors: "the witness's general familiarity with the defendant; the witnesses' familiarity with the defendant at the time the recording was made or where the witness observed the defendant dressed in a manner similar to the individual depicted in the recording; whether the defendant was disguised in the recording or changed his/her appearance between the time of the recording and trial; and the clarity of the recording and extent to which the individual is depicted." *Id.* ¶ 51. The court also said that "the absence of any particular

factor does not render the testimony inadmissible." *Id.* According to our supreme court, if lay opinion identification testimony "is admitted under the above standards, it would not invade the province of the jury because the jury is free to reject or disregard such testimony and reach its own conclusion regarding who is depicted in the surveillance recording." *Id.*

¶ 75    The *Thompson* court also held that "when the State seeks to introduce lay opinion identification testimony from a law enforcement officer, the circuit court should afford the defendant an opportunity to examine the officer outside the presence of the jury" and that, if the testimony is admitted, "the circuit court should probably instruct the jury, before the testimony and in the final charge to the jury, that it need not give any weight at all to such testimony and also that the jury is not to draw any adverse inference from the fact the witness is a law enforcement officer." *Id.* ¶ 59.

¶ 76    The identification testimony in this case was properly admitted in accordance with the *Thompson* criteria. Each witness was familiar with Mr. Gayden's appearance at the time of the shooting: Mr. Jaber testified that Mr. Gayden was an almost-daily customer of his, Mr. Murdock told the ASAs in his prior statements—which we will discuss further and in more detail in the next section—that he and Mr. Gayden were friends and had gone to the liquor store together, and Sergeant Lopez testified that he had known Mr. Gayden since 2007 and had spoken to him "half a dozen times." Witnesses also testified that at trial Mr. Gayden had a different appearance than at the time of the shooting—at trial he appeared to have lost weight, was wearing glasses, and had a different hairstyle. And, perhaps most importantly, the quality of the surveillance footage was poor—it was grainy and difficult to make out specific details.

¶ 77    With respect to Sergeant Lopez, the trial court conducted a hearing before trial which gave Mr. Gayden the required "opportunity to examine the officer outside the presence of the jury" (*id.*)

18

and instructed the jury that it should not draw an inference adverse to Mr. Gayden simply because the sergeant was a law enforcement officer.

¶ 78   Because of their independent knowledge of Mr. Gayden, the poor quality of the surveillance video, and Mr. Gayden's changed appearance, it was reasonable for the trial court to conclude that the identification testimony of Mr. Jaber, Mr. Murdock, and Sergeant Lopez was rationally based on the perception of each witness and would have aided the jury in determining the identity of the shooter in the video.

¶ 79   Mr. Gayden largely emphasizes the poor quality of the video as a reason these witnesses should *not* have been permitted to testify, but that is contrary to how the supreme court suggested this factor would apply. Although not explicit to its holding, in looking to federal law for guidance on this subject, the court noted that "many courts" found that lay opinion identification testimony is more helpful to the jury and "more likely to be admissible where the surveillance recording is of poor or grainy quality, or where it shows only a partial view of the subject." *Id.* ¶ 48.

¶ 80   Mr. Gayden additionally argues that the "evolution of matters over the course of the case" weighs against the admissibility of the opinion identifications by Sergeant Lopez and Mr. Jaber. Mr. Gayden argues that Sergeant Lopez "claimed" to know Mr. Gayden from observing him operate drug sales despite having not memorialized any such observations in "contact cards." But the trial court heard this testimony at the pretrial hearing, and Mr. Gayden had the opportunity to cross-examine Sergeant Lopez at that time. It is well-established that "a court of review will not substitute its judgment for that of the trier of fact on questions involving the weight of the evidence or the credibility of the witnesses." *People v. Gray*, 2017 IL 120958, ¶ 35.

¶ 81   Mr. Gayden relies on the fact that Mr. Jaber was initially unable to identify Mr. Gayden in court during the hearing, but then revealed, just before he testified, that he could, in fact, identify

19

Mr. Gayden in court. These circumstances, however, relate to the weight to be given to the testimony, not the admissibility of the testimony itself. There was plenty of evidence that Mr. Gayden looked different at trial than he had at the time of the shooting almost six years before. Defense counsel questioned Mr. Jaber about his failure to identify Mr. Gayden as the shooter in the courtroom earlier that day, and Mr. Jaber explained that Mr. Gayden looked different than he did at the time of the shooting. It was within the province of the jury to accept or reject Mr. Jaber's identification. *Id.* These circumstances do not affect the admissibility of his identification.

¶ 82    Mr. Gayden also argues that the trial court erroneously ruled that Mr. Jaber's identification of Mr. Gayden was admissible *before* holding a hearing, essentially shifting the burden to Mr. Gayden to prove that the identification was not admissible. But this is simply not what occurred.

¶ 83    The court heard argument on the admissibility of Mr. Jaber's identification testimony. After reviewing *Thompson*, the trial court stated that it would allow the testimony because it would "not invade the provinces of the Jury," noting that "based on what the parties ha[d] told" the court, Mr. Jaber had familiarity with Mr. Gayden, Mr. Gayden's appearance had changed since the time of his arrest, and the video was not clear. The court then held the hearing the following day, at which time Mr. Jaber's testimony matched the representations made by the State and the court confirmed the admissibility of his identification testimony.

¶ 84    This was not an error. The court's initial ruling was based on the representations of the State as to Mr. Jaber's testimony which were confirmed at an evidentiary hearing. The court made this clear, stating, "I know yesterday I said that the State's motion was granted, but that's only granted if they can establish with the witnesses the totality of the circumstances and that's why I held it for a hearing today." There was no improper burden shifting.

¶ 85      2. The Trial Court Did Not Err Instructing the Jury on Identifications

¶ 86    Mr. Gayden also argues that the trial court erred legally when it instructed the jury just before each witness made their identifications. The instruction was substantially as follows:

> "[L]adies and gentlemen, you will hear testimony from witnesses that it is their opinion the identity of the man depicted in the video before and during the shooting is Samuel Gayden.
>
> In considering the opinion testimony of a witness, you must decide what weight to give the evidence. In weighing the opinion evidence, you are not to draw any adverse inference against [Mr. Gayden] if such testimony is given by a law enforcement officer.
>
> Where the opinion testimony of a witness differs from your own observations of the video, you need not give any weight at all to such opinion testimony."

¶ 87    The purpose of a jury instruction is "to guide the jury in its deliberations and to assist the jury in reaching a proper verdict through application of legal principles to the evidence and law." *Parker*, 223 Ill. 2d at 501. Mr. Gayden argues that this instruction failed to do so because it "virtually directs the jury to accept the identifications."

¶ 88    The State argues that Mr. Gayden has forfeited review of this issue because his trial counsel agreed to it. This is true, but forfeiture is a limitation on the parties, not on the reviewing court. *People v. Holmes*, 2016 IL App (1st) 132357, ¶ 65. And here, because Mr. Gayden also supports his ineffective assistance of counsel claim with his trial counsel's failure to object to what he now argues was an improper instruction, we will address the merits of this argument.

¶ 89    On the merits, the State points out that the trial court's instruction is consistent with the supreme court's announcement in *Thompson* that a trial court should instruct the jury "before the testimony and in the final charge to the jury, that it need not give any weight at all to such testimony and also that the jury is not to draw any adverse inference from the fact the witness is a law

enforcement officer if that fact is disclosed." *Thompson*, 2016 IL 118667, ¶ 59.

¶ 90    The instruction given by the trial court precisely follows the holding of *Thompson*, and it did not require the jury to accept the identifications. As with any evidence, the jury was free to determine how much weight to give to each identification. *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006). This was not an improper instruction.

¶ 91    C. The Admission of Mr. Murdock's Prior Statements Was Not an Abuse of Discretion

¶ 92    Mr. Gayden next argues that the trial court erred in admitting the two prior statements of Mr. Murdock as substantive evidence: his oral statement to ASA Carroll 10 days after the shooting and his written statement to ASA Villareal in April 2011. Specifically, Mr. Gayden argues that neither statement was admissible as substantive evidence, that the trial court erred by not correctly instructing the jury that the statements were admissible only as impeachment, and that the oral statement was not even inconsistent and therefore was completely inadmissible. We review these admissibility issues for an abuse of discretion. *People v. Wilson*, 2012 IL App (1st) 101038, ¶ 38.

¶ 93    Generally, "hearsay, defined as an out of court statement *** offered to prove the truth of the matter asserted, is inadmissible at trial." (Internal quotation marks omitted.) *Id*. One exception to the general rule, however, is "for prior inconsistent statements of a testifying witness, which may be admitted to impeach the witness's credibility." *Id.* In addition, pursuant to section 115-10.1 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-10.1 (West 2016)), a prior inconsistent statement may also be offered as *substantive* evidence if specific criteria are met. The statute requires that the witness be subject to cross-examination and that: "(1) the statement is inconsistent with the witness's trial testimony," (2) "the witness acknowledged under oath the making of the statement *** at a trial, hearing, or other proceeding," and (3) the statement "narrates, describes, or explains an event or condition of which the witness had personal

knowledge." 725 ILCS 5/115-10.1(c)(2)(B) (West 2016). The statements at issue in this appeal met the three criteria for admissibility as substantive evidence under the statute.

¶ 94     First, Mr. Murdock's prior statements were inconsistent with his trial testimony. For the purposes of section 115-10.1, the term "inconsistent" "is not limited to direct contradictions but also includes evasive answers, silence, or changes in position." *People v. Cook*, 2018 IL App (1st) 142134, ¶ 43. At trial, Mr. Murdock testified that he went to the liquor store alone on September 1, 2010, that he was kicked out, that he heard gunshots as he was walking away, and that he then ran away down the alley. He also testified that he did not know Mr. Gayden, although he later admitted to recognizing him when shown a photo. Mr. Murdock's pretrial statements that he knew Mr. Gayden, had gone to the liquor store with a group that included Mr. Gayden, was with Mr. Gayden after the shooting, and that he could identify Mr. Gayden in the video of the shooting all directly contradicted his testimony at trial.

¶ 95     Mr. Murdock's admission that he made the prior statements—under oath at trial—does not render them consistent with his trial testimony. Rather, this met the second criterion for substantive admissibility under section 115-10.1. The statute requires that "the witness acknowledged under oath the making of the statement *** at a trial, hearing, or other proceeding." 725 ILCS 5/115-10.1(c)(2)(B) (West 2016). See also *People v. Stremmel*, 258 Ill. App. 3d 93, 117 (1994) (finding a witness's prior inconsistent statement to be admissible as substantive evidence where the witness acknowledged at trial having made the statement, but not the prior inconsistent statement that the witness could not recall having previously made).

¶ 96     Finally, the third criterion was met because both of Mr. Murdock's prior inconsistent statements involved him narrating or explaining the events of September 1, 2010, of which he had personal knowledge. Mr. Gayden argues that because Mr. Murdock was not an eyewitness to the

23

shooting, he could not claim personal knowledge of the shooter's identity. Mr. Gayden relies on *People v. Simpson*, 2015 IL 116512. In *Simpson*, our supreme court held that a witness's videotaped statement that he heard the defendant confess to the crime at issue was not admissible as substantive evidence because the witness "had no personal knowledge of the beating allegedly delivered by [the] defendant." *Id.* ¶ 34. Here, in contrast to *Simpson*, Mr. Murdock's prior statements involved the events of the night of the shooting that were within his personal knowledge.

¶ 97     In summary, both of Mr. Murdock's prior statements were inconsistent with his trial testimony, he admitted to making both statements, and his statements involved events surrounding the shooting within his personal knowledge. Accordingly, they were properly admitted as substantive evidence under section 115-10.1.

¶ 98     Mr. Gayden's argument that the trial court should have instructed the jury on the limited purpose for which these statements were admitted is based on his claim that the statements were not properly admitted as substantive evidence. Because we have found that the statements were properly admitted substantively, Mr. Gayden's argument on this point is now moot.

¶ 99          D. Mr. Gayden Did Not Receive Ineffective Assistance of Trial Counsel

¶ 100   Mr. Gayden's last argument is that he received ineffective assistance of trial counsel, largely based on the "aforesaid errors" argued throughout the rest of his brief. An ineffective assistance of counsel claim "is evaluated under the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984)." *People v. Henderson*, 2013 IL 114040, ¶ 11. To show ineffective assistance, a defendant must show both that "counsel's performance fell below an objective standard of reasonableness, and a reasonable probability exists that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. "A defendant's

failure to establish either prong of the *Strickland* test precludes a finding of ineffective assistance of counsel." *Id.*

¶ 101   Here, Mr. Gayden cannot make a showing under either prong of *Strickland*. Mr. Gayden's trial counsel vigorously tried this case, objecting to and preserving most of the evidentiary errors that Mr. Gayden claims on appeal. Moreover, as we have discussed, there was no error in the admission of any of this evidence. In addition to all of the challenged evidence, the gun used in the shooting was recovered from the apartment where Mr. Gayden was staying, the letters that appeared to reference the shooting had Mr. Gayden's name and prison information on them, and Mr. Gayden also appeared to discuss the shooting on the phone call recordings presented to the jury. In short, there was no showing of errors by counsel or any reasonable probability that Mr. Gayden would not have been convicted but for the alleged errors of counsel. Accordingly, Mr. Gayden cannot show he received ineffective assistance of trial counsel.

¶ 102                                    VI. CONCLUSION

¶ 103   For the foregoing reasons, we affirm the judgment of the trial court.

¶ 104   Affirmed.