2021 IL App (1st) 181936-U

No. 1-18-1936

Order filed September 27, 2021

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 16 CR 17769 |
| | ) | |
| LATAYUSS CURRY, | ) | Honorable |
| | ) | Thomas J. Byrne, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE WALKER delivered the judgment of the court.
Presiding Justice Hyman and Justice Coghlan concurred in the judgment.

**ORDER**

¶ 1   *Held*:   Defendant's aggravated battery to a peace officer conviction is affirmed where the evidence at trial was sufficient to show that defendant made physical contact of an insulting and provoking nature with a correctional officer by throwing a substance containing feces at him, and defendant's sentence was not excessive considering the circumstances of the offense and defendant's extensive criminal history and disciplinary record.

¶ 2   Following a jury trial, defendant Latayuss Curry was convicted of aggravated battery of a

correctional institution employee and sentenced to 12 years' imprisonment. On appeal, Curry

asserts that the State failed to prove him guilty beyond a reasonable doubt, where the State's key witness's testimony was contradicted by the video evidence at trial. Additionally, Curry argues his 12-year sentence was excessive considering the nature of his offense and mitigating evidence regarding his upbringing. We affirm.

¶ 3                              BACKGROUND

¶ 4      Curry was charged by indictment with four counts of aggravated battery of a correctional institution employee. The State nol-prossed two of the counts and proceeded to trial on two counts alleging that on September 10, 2016, Curry, in committing a battery, knowingly made physical contact of an insulting or provoking nature with Anthony Hantak and Mark Tokarz, knowing them to be correctional institution employees of the Cook County Department of Corrections (CCDOC) performing their official duties, when he threw "a substance" on them (720 ILCS 5/12-3.05(d)(4)(i) (West 2016)). As Curry solely challenges the sufficiency of the evidence demonstrating that the substance, he threw made physical contact with Tokarz and his sentence, we recite only the evidence necessary to these issues.

¶ 5      At trial, Officer Tokarz testified that on September 10, 2016, at about 10:20 a.m., he and his partner Hantak approached Curry's cell to give him his medication. Hantak stood on Tokarz's left side, facing the cell door. Tokarz unlocked the "chuckhole" in the cell door, Curry put his hands through, and Tokarz handcuffed him in preparation for opening the cell door.

¶ 6      When Tokarz opened the cell door, he was "immediately struck" in the face with what seemed to be feces and urine "from a small plastic container." The substance got into his eyes and mouth and "probably" got on his chest. Tokarz and Hantak "performed an emergency takedown" on Curry. Tokarz could smell, taste, and feel the substance on him, and it was "hard to see," but

he managed to resecure Curry's handcuffs from his front to behind his back. After Curry threw the substance, he said "'get wild.'" Tokarz "had to go" take a shower to rinse the substance from his eyes and mouth. He also removed his clothes, put them in a bag, and later threw them away.

¶ 7    The State published surveillance camera footage to the jury depicting the incident from two different angles. Tokarz narrated the video. Our review of the footage shows two officers approaching a cell door. One of the officers, whom Tokarz identified as himself, reaches through the chuckhole in the door. He opens the cell door, and a substance can be seen flying through the air, though the trajectory and landing point of the substance is unclear. Tokarz immediately flinches backwards and moves his face to the right. A man, whom Tokarz identified as Curry, comes through the cell door, and struggles with the officers before they pin him to the ground. For a moment, a white object can be seen in Curry's hand. For most of the video footage, Tokarz's back is facing away from both camera angles and his face is never clearly visible.

¶ 8    The State asked Tokarz what happened in the video when Tokarz appeared to be "holding [his] face to the right." Tokarz stated, "I had fecal and urine matter on my face. I must have went to go wipe it off or tried to. It was very difficult to see at that point in time."

¶ 9    On cross-examination, Tokarz testified that Curry was in Cell 1083 that day. When Tokarz opened the cell door, he suddenly felt something, did not know where it came from, and then grabbed Curry and "took him down." After the incident, Tokarz saw his personal doctor. On redirect examination, Tokarz confirmed that Curry was "technically in segregation," but had a cellmate.

¶ 10    Officer Hantak largely testified consistently with Tokarz and identified Curry in court. Hantak added that the substance Curry threw directly hit Tokarz and Hantak was hit with "some

splash-back." The substance contacted Hantak's torso, the side of his face, and the inside of his ear, which he had to have flushed out. Afterwards, Curry screamed "'get wild' or 'get busy,'" a "common term in jail" used to "invok[e] more inmates." After they were struck, Hantak and Tokarz performed an emergency take down to "neutralize the situation." Once the scene was secured, Hantak showered and discarded his clothes. He went to a local hospital and received medical treatment and blood work to make sure he did not contract anything.

¶ 11     CCDOC lieutenant Jose Barajas testified when he arrived at the scene at approximately 10:20 a.m., he saw "cells covered with fecal matter as well as a juice bottle containing fecal matter all throughout the unit and close proximity of the cell." He recorded the "aftermath" with a handheld camera, capturing the juice bottle containing fecal matter and the fecal matter "spilt out the cell doors," on the floor, and inside the cell. The State published the footage Bajaras captured at the scene. Our review of the footage shows small puddles of a brown substance on the floor outside the cell. Larger splashes of the substance can be seen on the cell door numbered 1083, as well as on the door to the left numbered 1084. Footage of the cell's interior shows a brown-tinted bottle tipped on its side on the ground.

¶ 12     CCDOC officer James O'Donnell testified that on June 20, 2016, at about 1:20 p.m., he was passing out food trays to inmates with his partner, Officer Julio Zavala.[1] O'Donnell unlocked the chuckhole in Curry's cell door and passed food trays through to Curry's cellmate. As soon as the cellmate took the trays and walked away, Curry threw a milk carton with what appeared to be "feces and semen and urine" through the chuckhole on O'Donnell and Zavala and laughed. O'Donnell resecured the chuckhole and left to remove his clothes and decontaminate himself. The

_____

[1] The trial court granted the State's pretrial motion for leave to admit proof of other crimes.

State published surveillance camera footage of the incident.

¶ 13    CCDOC deputy Timothy Swisher testified that on April 9, 2017, at about 1:25 p.m., Curry was on disciplinary segregation in the segregation unit. Curry had requested cleaning supplies and Swisher came to deliver them. When Swisher opened Curry's cell door, Curry "rushed" from the back of the cell and squirted a shampoo bottle "filled with feces and urine mixture" at Swisher. Swisher stepped aside so that the substance only hit his arm, closed the door, and called for backup. Curry laughed as he was removed from the cell. The State published video evidence from an overhead surveillance camera and from a handheld camera possessed by the sergeant on duty at that time. The video evidence depicted the incident and the events afterwards, including Curry's extraction from the cell.

¶ 14    The jury found Curry guilty of the aggravated battery of Tokarz, but not guilty of the aggravated battery of Hantak. The trial court denied Curry's posttrial motion.

¶ 15    At sentencing, the presentence investigation report (PSI) as amended showed that in 2012, Curry was convicted of unlawful restraint and aggravated criminal sexual abuse and sentenced to two years' probation. In 2018, Curry was convicted on two separate aggravated criminal sexual assault charges and sentenced to two consecutive prison terms of 20 years. Curry also pleaded guilty to aggravated battery of a correctional institution employee in two separate 2018 cases in Kendall County and was sentenced to a five-year consecutive prison term in each case.

¶ 16    The PSI reflected that, at the time it was written, Curry had the following pending criminal cases: two cases for aggravated battery of a peace officer, one case for aggravated battery of a correctional institution employee, and eight cases for public indecency. The State informed the court that, in addition to the convictions reflected in the PSI, Curry pleaded guilty to an additional

conviction for aggravated battery of a correctional officer shortly before sentencing in the instant case, and he received a five-year prison term in that case.

¶ 17    The PSI stated that Curry did not know his father and was the youngest of five children. Curry reported that his mother raised him until he was four but had a "drug problem." The Department of Children and Family Services (DCFS) took him from her care and placed him with a foster mother, who was physically abusive towards him. Curry ran from home over 10 times and dropped out of high school after his sophomore year because he was "'running the streets,'" and his high school grades were "D's and F's." He was unemployed, had no employment history, lived in a half-way house prior to his incarceration, was single, and had no children. Curry reported he had attention deficit hyperactivity disorder and bipolar disorder, saw "various doctors" in his correctional facility, was on medications to control his symptoms, and previously used cocaine daily.

¶ 18    In aggravation, the State called CCDOC sergeant Anthony Skueo. Skueo testified that on February 17, 2017, he was working as a sergeant for the emergency response team when he saw Officer John Bellini exit Curry's tier "covered in brown liquid, which was feces." Bellini had the feces on his face, body, and leg and said that Curry "sprayed him through the door" with the feces. When Skueo and other officers went to Curry's cell, Curry repeatedly refused to comply with orders, spit on the officers, resisted, and did not comply until he was tased in the leg. Skueo testified Bellini was injured by the feces thrown on him, and Sergeant Taylor received a shoulder injury when Curry resisted and was tased.

¶ 19    The State additionally presented Curry's disciplinary records from Cook County and Kendall County, as well as a transcript of a bond hearing occurring on November 18, 2016. The parties stipulated to the exhibits' foundation.

¶ 20    The State argued in aggravation that Curry had "three live felonies" and "at least eight charged misdemeanors of public indecency" pending. It requested that the court consider those cases in aggravation, including O'Donnell's trial testimony regarding the aggravated battery in case number 16 CR 16148, stating it would nol-pros all pending charges in exchange for a higher sentence in the instant case.

¶ 21    The State argued Curry's disciplinary reports showed he had "a complete disregard for authority," as he was involved in "at least 33 disciplinary incidents in Cook County and at least 21 in Kendall." Curry's disciplinary issues in Cook County "start[ed] in April of 2015," when Curry began fighting with other inmates. From then on, Curry *inter alia* "exposed himself" to, or masturbated in front of, personnel and attorneys on multiple occasions; "tamper[ed]" with his cell door; became "resistant and combative" with correctional officers; and projected feces, urine, and spit on personnel multiple times. Curry flooded his cell; refused medication; kicked a sergeant to the ground; refused to take his arm out of his chuckhole and said he was "going to go wild and throw s*** on them"; lied to staff that he needed medication because "he placed an object in his penis"; and threatened the life of a nurse. Curry also "approached an officer in an aggressive manner and had to be taken down to the ground"; threw a bottle of urine at another inmate; attempted to headbutt officers, kick an officer in the leg, and elbow an officer in the face; and "kick[ed] trash out of his cell."

¶ 22 While in confinement in Kendall County, Curry *inter alia* spread feces on the window of his cell; masturbated in front of multiple officers; destroyed a "suicide mat"; flooded his cell; and threw urine and feces at deputies. Curry was also found to have in his cell two Styrofoam cups full of feces, a spoon sharpened into a point, and Benadryl, Trazodone, and a tray he was not supposed to have. The State argued Curry should receive the maximum 14-year sentence.

¶ 23 In mitigation, the defense cited, without objection, a mitigation report prepared in a different case. Defense counsel argued Curry was two weeks old when he was first involved with DCFS and was removed from his home when three months old. Curry was "in and out of foster care," had "at least ten hospitalizations," and was also diagnosed with early childhood depression at the age of one. Curry had prenatal exposure to cocaine, as well as development coordination and expressive language disorders, "[a]ll before the age of one."

¶ 24 At the age of two, Curry was additionally found to be "cognitively functionally delayed" and was referred to a therapist. However, the foster home "never followed up with that therapy" and he was removed "when there were allegations of sexual abuse by the foster family at the age of three." Under new foster care, Curry was found to have an "IQ of 73, which is a borderline range." At the age of five, Curry was removed from foster care and placed with a family member, and his mother's rights were subsequently terminated when he was six years old. Counsel observed that during Curry's time in foster care, there were "many reports of self-harm, of suicide attempts, of diagnosis requiring medication which Mr. Curry did not receive."

¶ 25 During Curry's most recent admission to the hospital in March 2015, he "was found to have psychiatric symptoms of fidgeting, being depressed, helpless, angry, irritable, distractible and having hallucinations at night." Curry was diagnosed with bipolar disorder and suffered from

cocaine and cannabis abuse prior to his first arrest. Counsel stated that Curry had been in custody since mid-2015, had "obviously picked up more cases," and was "on and off medication" while in the CCDOC. Counsel stated he had been working with Curry for one and a half years and had "never had an issue" with him, and that Curry had "helped in preparing for his case." According to counsel, Curry was now in contact with his mother, and she was "in a place where she can support him in whatever way she can."

¶ 26    As to the disciplinary measures cited by the State, defense counsel asserted that Curry "was already punished for those actions including given 60 or 30 days of segregation." Counsel stated, "The entire time I have known Mr. Curry he's pretty much been in segregation." Counsel acknowledged Curry was "looking at an extended term" and would serve a "long time in IDOC" with all the other cases but asked that the court "go along with what the other courts have done" and sentence Curry to a prison term of five years or less.

¶ 27    The circuit court stated it had considered the factors in aggravation and mitigation, the PSI and its amendments, and the circumstances of the offenses and character of Curry. The court stated it was familiar with "many of the incidents in aggravation brought to the Court's attention," as they were "part and parcel of the trial [it] presided over," and the court had a "clear recollection" of the trial testimony. The court was impressed by the restraint shown by the guards "after being attacked with such vile substances," and noted "defendant's actions, his choices, his continued behavior *** requires that he be kept in segregation."

¶ 28    The court found that the evidence indicated defendant is "not likely" to be "reformed." It found defendant's behavior "during the course of trial," where he repeatedly attempted to douse the jail guards with feces, "demonstrates his clear intent to be as disruptive and vile as possible."

The court noted the costs incurred due to Curry's behavior in confinement, including "segregation expenses," and the personnel needed to ensure Curry "doesn't hurt himself or somebody else." The court stated that while the penitentiary might not change Curry's attitude immediately, he would grow old there and, over time, have the opportunity to "change his ways and be a different person." While the court felt Curry deserved a maximum 14-year extended term sentence, it stated it would "be lenient" and sentence him to 12 years' imprisonment. The State nol-prossed "[a]ll other cases pending" against Curry. The court denied Curry's motion to reconsider his sentence.

¶ 29                                 ANALYSIS

¶ 30    On appeal, Curry first argues that the State failed to prove him guilty beyond a reasonable doubt, where the video evidence submitted by the State contradicted Tokarz's testimony that he was struck by a liquid substance. The State responds that the evidence was sufficient to establish Curry's guilt, and the video did not contradict Tokarz's testimony but rather corroborated it, as did the State's other witnesses.

¶ 31    Due process rights under the United States Constitution require "that a person may not be convicted in state court 'except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.'" *People v. Cunningham*, 212 Ill. 2d 274, 278 (2004) (quoting *In re Winship*, 397 U.S. 358, 364 (1970)). When reviewing a challenge to the sufficiency of the evidence at trial, this court considers "'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" (Emphasis in original.) *People v. Cooper*, 194 Ill. 2d 419, 430-31 (2000) (quoting *Jackson v. Virginia*, 433 U.S. 307, 319 (1979)).

¶ 32    It is not this court's role to retry the defendant. *People v. Nere*, 2018 IL 122566, ¶ 69. Rather, it is the role of the trier of fact "to determine the credibility of witnesses, to weigh their testimony, to resolve conflicts in the evidence, and to draw reasonable inferences from the evidence." *People v. Williams*, 193 Ill. 2d 306, 338 (2000). The trier of fact need not "disregard inferences which flow normally from the evidence before it," or "search out all possible explanations consistent with innocence and raise those explanations to a level of reasonable doubt." *In re Jonathon C.B.*, 2011 IL 107750, ¶ 60. We "must allow all reasonable inferences from the record in favor of the prosecution" (*People v. Givens*, 237 Ill. 2d 311, 334 (2010)), and will not reverse a conviction unless the evidence is "so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt" (*People v. Bradford*, 2016 IL 118674, ¶ 12).

¶ 33    Relevant here, a person commits aggravated battery "when, in committing a battery, other than by discharge of a firearm, he or she knows the individual battered" to be a "correctional institution employee *** performing his or her official duties." 720 ILCS 5/12-3.05(d)(4)(i) (West 2016). "A person commits battery if he or she knowingly without legal justification by any means *** makes physical contact of an insulting or provoking nature with an individual." 720 ILCS 5/12-3(a) (West 2016).

¶ 34    Curry does not contest that he knew Tokarz was a corrections officer performing his official duties, that he threw the substance at Tokarz, or that such contact would constitute an insulting or provoking contact if actual contact was made with the substance. Rather, he argues that the State failed to prove the substance made actual physical contact with Tokarz.

¶ 35    Construed in the light most favorable to the State, the evidence at trial was sufficient to support Curry's conviction for aggravated battery. Correctional officers Tokarz and Hantak testified that, when Tokarz opened Curry's cell door, Tokarz was immediately struck by a substance that appeared to contain "feces and urine matter." Hantak testified some of the substance also splashed onto him, and that Curry threw the substance. Tokarz testified that the substance got into his eyes and mouth and "probably" got on his chest. Tokarz afterwards decontaminated himself, threw away his clothes, and consulted a doctor. Hantak acted similarly to clean himself up. The video evidence shows a substance briefly flying through the air, an object in Curry's hand when the door opens, and Tokarz flinching away and turning his head immediately after he opens the door. Lieutenant Barajas recorded video showing fecal matter inside and outside Curry's cell, including a bottle containing fecal matter inside the cell. Other crimes evidence showed Curry committed similar offenses before and after the instant offense.

¶ 36    The testimony of even a single credible witness is sufficient to support a conviction. *People v. Gray*, 2017 IL 120958, ¶ 36. Tokarz and Hantak's testimony that Tokarz was struck by fecal matter thrown by Curry, supported by the video evidence, was ample to show Curry made physical contact of an insulting or provoking nature with Tokarz. *People v. Nichols*, 2012 IL App (4th) 110519, ¶ 43 (finding the evidence showed the defendant contacted an officer in an insulting or provoking manner where the defendant threw an "unknown liquid" in an officer's face, and the officer reacted by cleaning himself and seeking examination in a prison health care facility); *People v. Walker*, 291 Ill. App. 3d 597, 602-04 (1997) (finding the defendant made physical contact of an insulting or provoking nature where the defendant threw a substance believed to be urine onto an officer).

¶ 37    Curry argues that the video footage contradicts the testimony that the substance thrown by Curry made contact with Tokarz. Curry asserts the footage shows Tokarz maintains physical control over him "the entire time and not once does he stop to wipe his face, eyes, or any other part of his body" as he claimed in his testimony, and he does not "break even briefly to react from the substance allegedly thrown in his mouth and eyes." Curry claims the video only shows "a substance flying in the air and Tokarz immediately taking Curry to the ground and securing his hands behind his back." We disagree.

¶ 38    First, it is not at all clear from the video that the liquid substance only flew in the air and "miss[ed] Tokarz entirely." Having closely reviewed the video footage multiple times, we cannot clearly see the trajectory of the substance thrown by Curry or where it lands, whether the substance visible in the video represents all the substance that Curry threw, or whether the substance missed Tokarz. Further, the video clearly shows Tokarz immediately flinched backwards and held his face to the right as Curry exited the cell with an object in his hand, and then quickly took Curry to the ground. This corroborates Tokarz's testimony that, after he was hit with the substance, he immediately acted to secure Curry. The fact that he did not first stop to wipe fecal matter from his eyes in no way demonstrates he was not struck by that fecal matter.

¶ 39    Second, while Curry asserts that the video evidence contradicts Tokarz's apparent testimony that he wiped his face, it is clear from the trial transcript that Tokarz simply misunderstood the State's question about him "holding [his] face" to the right as shown in the video, and then speculated that he "must have went to go wipe it off or tried to." Lastly, and most crucially, it was the jury's role to resolve conflicts in the testimony and video evidence and it found

the evidence sufficient to show the fecal substance made physical contact with Tokarz; we defer to that determination. *Williams*, 193 Ill. 2d at 338.

¶ 40    Curry next asserts that his sentence was excessive considering the nature of the battery offense and Curry's "troubled upbringing." The State responds that Curry's sentence was not excessive where Curry was subject to extended sentencing, his offense was insulting and vile, and he had an extensive criminal history and disciplinary record.

¶ 41    When sentencing a defendant, a trial court must consider both "the seriousness of the offense" and "the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11; *People v. Wilson*, 2012 IL App (1st) 101038, ¶ 61. "[T]he trial court has broad discretionary powers in imposing a sentence," and its sentencing decision is entitled to deference. *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). A reviewing court may disturb the sentence "only if the trial court abused its discretion in the sentence it imposed." *People v. Jones*, 168 Ill. 2d 367, 373-74 (1995). A sentence is an abuse of discretion where it is "greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense."

¶ 42    Curry argues his sentence is excessive given the nature of the offense, asserting there was nothing unusual or especially aggravating about the aggravated battery at issue here and the crime was "more stupid than dangerous." He also argues his sentence is excessive considering his troubled upbringing and mental health issues. Given Curry's criminal history and the nature of the offense, we find the circuit court did not abuse its discretion in imposing a 12-year sentence.

¶ 43    The court must consider all aggravating and mitigating evidence at sentencing (*People v. Towns*, 2020 IL App (1st) 171145, ¶ 48), and Curry essentially argues the trial court failed to properly consider the mitigating evidence. Nonetheless, the court specifically stated it considered

the factors in aggravation and mitigation; the PSI, which included mitigating evidence regarding Curry's background; and the circumstances of the offense, which the court found vile. It also heard Curry make the same extensive argument regarding his upbringing and mental health as he raises here, and thus necessarily considered it. The record demonstrates the court properly considered all the relevant sentencing factors and Curry does not affirmatively show otherwise.

¶ 44    The court considered Curry's extensive criminal history and dozens of disciplinary issues while in confinement, which included repeated indecent exposure, public masturbation, attempted acts of violence towards officers and correctional staff members, property damage, and, as in the case at bar, throwing feces on officers. See *People v. Willis*, 235 Ill. App. 3d 1060, 1074-75 (1992) (prison disciplinary reports may be considered in aggravation and are relevant, as they relate "to the likelihood [the defendant] would commit other offenses"). Based on Curry's voluminous record of continuing, irremediable conduct, including his attempts to douse the guards with feces while in jail during the instant trial proceedings, the trial court found that Curry had a "clear intent to be as disruptive and vile as possible" and was not likely to be reformed. Given these findings, we do not find the 12-year sentence, 2 years below the maximum, an abuse of discretion. See *People v. Merritte*, 242 Ill. App. 3d 485, 495 (1993) (the trial court properly considered in aggravation defendant's "poor" disciplinary records while in prison and found said records "indicat[ed] a lack of potential for rehabilitation").

¶ 45                                    CONCLUSION

¶ 46    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 47    Affirmed.